2023-2008

_____

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

_____

In re: ALEXANDER I. SOTO, WALTER G. SOTO,
Appellants

_____

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board Application No. 17/138,794

_____

THIRD CORRECTED APPELLANT BRIEF

_____

Derek Meeker
LAURENCE & PHILLIPS IP LAW
1050 Connecticut Ave., N.W., Suite 500
Washington, D.C. 20036
202-558-6968

Matthew C. Phillips
LAURENCE & PHILLIPS IP LAW
1050 Connecticut Ave., N.W., Suite 500
Washington, D.C. 20036
503-964-1129

Kevin B. Laurence
LAURENCE & PHILLIPS IP LAW
1050 Connecticut Ave., N.W., Suite 500
Washington, D.C. 20036
703-448-8787

*Counsel for Appellants*

February 29, 2024

# REPRESENTATIVE CLAIM

1.  A Local Area Network (LAN) client for a passive optical LAN, the passive optical LAN disposed to having a head end and one or more passive optical splitters for coupling the LAN client over one or more optical fibers to the head end of the passive optical LAN, the LAN client for a passive optical LAN comprising of:

an optical interface for converting a downstream optical signal on a downstream optical wavelength to a downstream electrical signal and for converting an upstream electrical signal to an upstream optical signal and emitting the upstream optical signal on an upstream optical wavelength;

at least one network interface for receiving user data; and

a control module electrically coupled to the optical interface and electrically coupled to the at least one network interface and wherein the control module processes the downstream electrical signal having a downstream control and downstream data information to recover an upstream bandwidth allocation from the downstream control information and wherein the control module receives user data from the at least one network interface and the control module responsive to the upstream bandwidth allocation generates the upstream electrical signal having upstream control and upstream data information and wherein at least a portion of the user data is included in the upstream data information,

whereby the LAN client for a passive optical LAN communicates user data upstream responsive to an upstream bandwidth allocation.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---:|:---|
| **Case Number** | 2023-2008 |
| **Short Case Caption** | In re: Soto |
| **Filing Party/Entity** | Alexander I. Soto and Walter G. Soto |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/29/2024

Signature: /s/ Derek Meeker

Name: Derek Meeker

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Alexander Ivan Soto | NextGen Innovations, LLC (for Alexander I. Soto and Walter G. Soto) | |
| Walter Glenn Soto | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable       ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)   ☐ No   ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable       ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS ..................................................................... iv

TABLE OF AUTHORITIES ................................................................ vi

STATEMENT OF RELATED CASES ...................................................... ix

I.      JURISDICTIONAL STATEMENT .................................................. 1

II.     STATEMENT OF THE ISSUES ..................................................... 2

III.    STATEMENT OF THE CASE AND FACTS ...................................... 3

        A.      Technological Background ................................................. 3

                1.      Optical Access Networks ....................................... 3

                2.      Local Area Networks (LANs) ................................. 8

                3.      Multiple-Access Protocols ..................................... 10

        B.      The '794 Application .......................................................... 14

                1.      Summary of Disclosure .......................................... 14

                2.      Early Office Actions ............................................... 17

                3.      Office Actions based on Husbands and Yuki .......... 18

                        a.      Husbands ................................................... 18

                        b.      Yuki ........................................................... 24

        C.      Proceedings Before the Board ............................................ 26

IV.     SUMMARY OF ARGUMENT .......................................................... 29

V.   ARGUMENT ...........................................................................31

    A.   Standards of Review ...............................................31

    B.   The Board's Findings in Support of Combining Husbands and
         Yuki Are Not Supported by Substantial Evidence. ...........33

         1.   Yuki Does Not Disclose an Optical LAN. ...............34

         2.   No Evidence Supports Applying Yuki's Protocol to a
              CSMA/CD-Based System. ..........................39

         3.   Husbands is Not Directed at Overcoming Problems
              with CSMA/CD. ....................................44

         4.   No Evidence Supports Applying a Master-Slave
              Protocol to a Peer-to-Peer System. .................46

    C.   Modifying Husbands With Yuki Would Require a Substantial
         Reconstruction and Render it Inoperable for its Intended
         Purpose. ...........................................................47

    D.   The Board Erred by Disregarding Arguments and Ignoring
         Evidence. ...........................................................52

    E.   The Board Erroneously Dismissed Relevant Arguments
         About the Nonobviousness of Combining Husbands and Yuki
         as "Not Commensurate in Scope With" or Not Tied to
         Specific Language of the Claims. ..............................55

    F.   The Board Erroneously Relied on Hindsight. ..................60

VI.  CONCLUSION .......................................................................64

# TABLE OF AUTHORITIES

**Cases**

*Applications in Internet Time, LLC v. RPX Corp.,*
897 F.3d 1336 (Fed. Cir. 2018) ................................................32

*Belden Inc. v. Berk-Tek LLC,*
 508 F.3d 1064 (Fed. Cir. 2015) ...............................................31

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.,*
229 F.3d 1120 (Fed. Cir. 2000) ................................................63

*Consol. Edison Co. v. Nat'l Labor Relations Bd.,*
305 U.S. 197 (1938) .....................................................................32

*Cutsforth, Inc. v. MotivePower, Inc.,*
 636 F. App'x 575 (Fed. Cir. 2016)..........................................53

*In re Chudik,*
851 F.3d 1365 (Fed. Cir. 2017) ................................................32

*Dickinson v. Zurko,*
527 U.S. 150, 119 S. Ct. 1816 (1999) .......................................32

*In re Enhanced Sec. Rsch., LLC,*
739 F.3d 1347 (Fed. Cir. 2014) ................................................59

*Forest Labs., LLC v. Sigmapharm Labs., LLC,*
918 F.3d 928 (Fed. Cir. 2019) ..................................................59

*In re Fritch,*
972 F.2d 1260 (Fed. Cir. 1992) ................................................49

*Gen. Elec. Co. v. Raytheon Techs. Corp.,*
983 F.3d 1334 (Fed. Cir. 2020) ................................................32

*In re Gordon,*
733 F.2d 900 (Fed. Cir. 1984) ..................................................49

*KSR Int'l v. Teleflex Inc.,*
550 U.S. 398, 421 (2007) ........................................................................62

*In re Lee,*
277 F.3d 1338 (Fed. Cir. 2002) ...............................................................53

*McGinley v. Franklin Sports, Inc.,*
262 F.3d 1339 (Fed. Cir. 2001) ...............................................................31

*Medichem, S.A. v. Rolabo, S.L.,*
437 F.3d 1157 (Fed. Cir. 2006) ...............................................................59

*In re Nuvasive, Inc.,*
842 F.3d 1376 (Fed. Cir. 2016) ....................................................... 53, 54

*OSA Pharms, LLC v. Apotex Inc.,*
939 F.3d 1375 (Fed. Cir. 2019) ...............................................................32

*Paice LLC v. Ford Motor Co.,*
881 F.3d 894 (Fed. Cir. 2018) .................................................................53

*Polaris Indus. v. Arctic Cat, Inc.,*
 882 F.3d 1056 (Fed. Cir. 2018) ...............................................................54

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.,*
786 F.3d 960 (Fed. Cir. 2015) .................................................................54

*In re Ratti,*
270 F.2d 810 (CCPA 1959) ......................................................................50

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*
299 F.3d 1313 (Fed. Cir. 2002) ...............................................................62

*Unigene Labs., Inc. v. Apotex, Inc.,*
655 F.3d 1352 (Fed. Cir. 2011) ....................................................... 59, 63

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ........................................................................1

35 U.S.C. § 144 ......................................................................................1

5 U.S.C. § 554(c)(1) ..............................................................................54

5 U.S.C. § 556(c)(3)(A) .........................................................................54

## STATEMENT OF RELATED CASES

United States Patent Appl. No. 17/726,504, entitled "COMMUNICATION

SYSTEM AND METHOD FOR AN OPTICAL LOCAL AREA NETWORK," filed

April 21, 2022, is a continuation of U.S. Patent Appl. No. 17/138,794, the patent

application that is the subject of this appeal.

# I. JURISDICTIONAL STATEMENT

Alexander and Walter Soto filed U.S. Patent Application No. 17/138,794 (Appx0031-0089) on December 30, 2020. The application was assigned to Examiner Li Lui, who in due course entered a final rejection (Appx3432-3479) on February 2, 2022. The Soto brothers appealed to the Patent Trial and Appeal Board, which assigned the case no. 2023-000477. The Soto brothers filed an appellate brief (Appx3515-3545), the Examiner filed an examiner's answer (Appx3550-3608), and the Soto brothers responded with a reply brief (Appx3612-3620). An oral argument was conducted before the Board remotely via remote video on March 23, 2023 (Appx3664-3680). The Board issued a decision (Appx0001-0020) affirming the Examiner's rejections on April 3, 2023. The Soto brothers timely filed a notice of appeal (Appx3684-3686) on June 1, 2023. This Court therefore has jurisdiction over this appeal based on 35 U.S.C. § 144 and 28 U.S.C. § 1295 (a)(4)(A)

## II. STATEMENT OF THE ISSUES

1.     Does substantial evidence support the Board's factual findings underpinning its conclusion that one of ordinary skill in the art would have combined Yuki and Husbands to result in the subject matter of the claims?

2.     Does substantial evidence support the Board's finding that Yuki discloses an optical local area network (LAN)?

3.     Does substantial evidence support the Board's finding that one skilled in the art would have applied Yuki's protocol to a CSMA/CD (carrier-sense multiple access with collision detection) system?

4.     Does substantial evidence support the Board's finding that Husbands is directed at overcoming problems with CSMA/CD?

5.     Does substantial evidence support the Board's finding that that one skilled in the art would have applied a master-slave communication scheme to a peer-to-peer communication system?

6.     Did the Board err by ignoring evidence contrary to its findings?

7.     Did the Board err by concluding that its combination of Yuki and Husbands would have been obvious when that combination would have rendered Husbands's system inoperable for its intended purpose?

8.     Did the Board err by concluding that a combination of Yuki and Husbands would have been obvious when that combination would have required a substantial redesign and reconstruction of Husbands?

9.     Is the Board's obviousness conclusion tainted by impermissible hindsight?

## III.    STATEMENT OF THE CASE AND FACTS

### A.    Technological Background

#### 1.    Optical Access Networks

Access networks and local area networks (LANs) are different types of networks.  Each has its own requirements and functions.  They are sometimes used together, but they are distinct networks.

As described in further detail below, an access network, as the name implies, provides computers and similar devices **access** to a particular resource, which may be another network such as the Internet.  An optical access network

provides computers and similar devices access to an optical network. The computers and similar devices that are provided access to the optical network may themselves be organized together as a network, one of example of which is a LAN. That is, an optical access network can provide a LAN access to another network such as the Internet via optical links.

The following diagram (Figure 7C from the "Song" reference) further illustrates the relationship between an optical access network and a LAN. The optical access network has a single optical line termination (OLT) and multiple optical network units (ONUs) with respect to a LAN and other networks such as the Internet:



FIG. 7C

Appx5286. Song explains, "Each ONU is Customer Premises Equipment that accesses the customer LAN networks via multiple Fast Ethernet connections and Tl connections." Appx5334 (¶ 232). As illustrated, a 10/100BaseT LAN is connected to the Internet through an OLT and the ONU associated with the LAN.

The OLT, passive optical network (PON), and ONUs form the optical access network. This is shown, for example, in the following diagram from the International Telecommunication Union (ITU), where the optical access

network is the portion in the middle between "UNI" on the left and "SNI" on the

right:



ONU    Optical Network Unit
ONT    Optical Network Termination
OLT    Optical Line Termination
NT     Network Termination

**Figure 1/G.983.1 – Network architecture**

Appx0823; *see also* Appx0822 (defining "Optical Access Network (OAN)").

Referring to Figure 7C of Song and Figure 1 of ITU-T G.983.1, a LAN may

be connected to the "home network" side on the left and the Internet may be

connected to the ONT. In fact, that ITU document defines "UNI" as "User Network Interface." Appx0821.

As can be seen, an optical access network includes one OLT. The flow of data in an optical access networks is between the OLT and ONUs. This is a point-to-multipoint architecture in the downstream direction (from the OLT to the ONUs). In "'point-to-multipoint' broadband access networks, . . . downstream signals are broadcast from a single head-end facility to multiple end user stations (*i.e.*, via 'point-to-multipoint' transmission), and upstream signals are transmitted from each respective end user to the head end facility (*i.e.*, via 'point-to-point' transmission)." Appx3999 (1:14-18); *see also* Appx3910 (¶ 6).

The OLT acts as a master for the optical access network, and the ONUs are its slaves. *See* Appx0825 ("The Optical Line Termination (OLT) . . . is responsible for managing all the PON [passive optical networks] specific aspects of the ATM [asynchronous transfer mode] transport system."); Appx0862 ("[P]rincipally the ONU slaves to the OLT."). A slave station is "the station that (a) is selected and controlled by a master station and (b) usually can only call, or be called by, a master station." Appx4960; *see also* Appx5255 (5:3-10) ("The OLT 1 determines

the phase of each arriving ranging pulse, and then transmits control signals to the respective ONU 2 to adjust the launch power of that ONU, and to retard or advance the timing of the transmission from that ONU in order to [minimize] the phase offset between the received data from that customer terminal and the intended position of that data within the return frame structure."; Appx5253 (1:47-56).

## 2. Local Area Networks (LANs)

As noted above, LANs are typically present at the user side of access networks. In general, a LAN is a network within a geographically limited (*i.e.*, "local") area. *See* Appx4565 (defining LAN). LANs are distinct from metropolitan area networks (MANs) and wide area networks (WANs) in terms of size. *See id.* A MAN is "[a] network that usually (a) covers an area larger than a local area network (LAN) and smaller than a wide area network (WAN) . . . ." Appx4615. An example of a WAN is the Internet. Appx5375 (¶ 63). Examples of LANs include data networks in "a single office building or a complex of buildings and laboratories such as a university campus." Appx0985.

Whereas an access network is a specific type of network that provides access to a particular network, a LAN is just a plain vanilla type of network that simply provides connectivity among a number of computers and/or similar devices within a small area. A LAN, by itself, does not provide access to another network like an access network. In fact, a "gateway" or "bridge" is needed to allow two different LANs to communicate. *See* Appx4428 (explaining that a gateway "is used for interconnecting (i) dissimilar local area networks (LANs), (ii) devices on the same LAN that use different high-level protocols, and (iii) LANs with networks of different architectures"); Appx4108 (explaining that a bridge is like a gateway but used to extends the distance span and capacity of a single LAN).

In a typical LAN "total connectivity is achieved" as any node in the LAN can communicate (directly or indirectly) with any other node. Appx0985. A LAN is "data communications system that allows a number of independent, nonhomogeneous devices to communicate with each other." Appx0985. In Husbands's LAN, for example, "any terminal can initiate communications to other terminals." Appx3712 (1:7-8 and 2:36-37).

### 3. Multiple-Access Protocols

When several devices must share a communication medium or channel, they must use some protocol to coordinate the sharing. Those are multiple-access protocols, and there are a variety of well-established ones, including FDMA (frequency division multiple access), CDMA (code division multiple access), TDMA (time division multiple access), and CSMA (carrier sense multiple access). Those are all protocols related to sharing the medium; however, each achieves that in a different way with different advantages and drawbacks.

FDMA divides a communication channel into a number of frequency subbands, which are assigned to particular devices or particular pairs of devices. That is, the overall available frequency spectrum is divided into subchannels that can be used simultaneously. *See* Appx4411 (defining FDM as "[t]he multiplexing, *i.e.*, the deriving, of two or more simultaneous, continuous channels from a propagation medium by assigning separate portions of the available frequency spectrum to each of the individual channels" and FDMA as "[t]he use of frequency division to provide multiple and simultaneous transmissions to a single transponder.").

Rather than dividing the frequency spectrum, TDMA divides time into discrete time intervals and assigns particular intervals to a particular device or pair of devices. *See* Appx5061-5062 (defining TDM by saying, "In a single channel operating in a given frequency spectrum and in a propagation medium connecting two or more points, the derivation of two or more concurrent channels, such as fiber optic channels, from the single channel by assigning discrete time intervals, in sequence, to each of the derived channels, *i.e.*, a form of parallel to serial conversion" and TDMA as "the allocation of unique time slots to the different users of a common channel.").

CDMA is conceptually similar to FDMA at a high level but uses special codes, rather than time or frequency, to divide the channel. Simultaneous transmissions on the same channel encoded with different codes either do not interfere or minimally interfere because the codes are designed to have no or low cross-correlation. *See* Appx4154 (defining CDMA as "[m]odulation that (a) independently codes data in multiple channels for transmission over a single wideband channel, such as a fiber optic channel, (b) may be used as an access method that permits carriers from different stations to use the same transmission

equipment by using a wider bandwidth than the individual carriers, and on reception, each carrier can be distinguished from the others by means of a specific modulation code, thereby allowing for the reception of signals that were originally overlapping in frequency and time, (c) permits several transmissions to occur simultaneously within the same bandwidth, with the mutual interference reduced by the degree of orthogonality of the unique codes used in each transmission. . . . [S]everal transmissions can occur simultaneously within the same bandwidth with the mutual interference reduced by the degree of orthogonality of the unique codes used in each transmission.").

CSMA is different. In simplified terms, CSMA is a listen-before-talking protocol where one unit transmits at a time. *See* Appx4124 (defining CSMA as "[a] network control feature in which a transmitter checks for a clear channel, such as a clear fiber optic channel, before transmitting."). Multiple devices share the same channel (*i.e.*, carrier) and sense the carrier before transmitting. If the carrier is detected, that means another device is transmitting, and the sensing device must wait to try again later. If the carrier is not detected, the channel is

unused and the device may transmit its message. After the device finishes its transmission, other devices can sense the channel and transmit if it is clear.

In CSMA/CD, collisions are detected. A collision occurs when two devices attempt to use the channel at the same or approximately the same time. Various collision mitigation techniques are possible. Husbands, one of the references at issue in this appeal, provides the following explanation of CSMA/CD:

> This protocol features no central controller and any terminal can initiate communications to other terminals. To accomplish this task, the initiating terminal first listens to determine the availability of the transmission medium. If the line is quiet, the source terminal sends out a command packet followed by the message. The command packet contains both the destination address and the source address. Upon hearing its address, the receiving terminal copies the message. This process is termed "listen before talk" (LBT).
>
> * * *
>
> Because of inherent delays in the transmission medium, two terminals located some distance from one another

can initiate almost simultaneous transmissions based on each hearing a quiet line. This simultaneous transmission creates a collision on the line, producing garbled data.

* * *

To abort the transmission of an invalid packet upon detection of a collision, a technique called "listen while talk" (LWT) has been developed. The collision detection process can take several forms . . . .

Appx3712 (2: 35-66); *see also* Appx4124-4125 (defining CSMA/CD).

## B.    The '794 Application

### 1.    Summary of Disclosure

Figure 1 of the '794 Application illustrates a LAN 50 having a network manager (NM) 100 and several network client adapters (NCAs) 104:



**FIG. 1**

Appx0042; *see also* Appx0064 (¶ 23). "The optical local area network 50 transfers data between an NM 100 and the NCAs 104 in the form of downstream frames (NM 100 to NCAs 104) and upstream 'virtual frames' (NCAs 100 to NM 104)." Appx0067 (¶ 32). Figure 2 illustrates a downstream frame 200 and an upstream virtual frame 202, and an upstream frame 224:



**FIG. 2**

Appx0043 ('794 Appl. Fig. 2); *see also* Appx0067-0068 (¶¶ 33, 35). NCAs are

allocated slots in a network period. "The virtual upstream frame 202 is

partitioned into slots, where a 'slot' corresponds to a fixed number of bits or a

fixed length of time within a virtual frame." Appx0068 (¶ 34). "Slot allocation

start and end numbers are allocated within the virtual upstream frame so that

slot allocations do not overlap, ensuring that there are no collisions of data from

different NCAs 104 at the NM 100." *Id.*

## 2. Early Office Actions

The Examiner issued four substantive Office actions in this application. The first two Office actions rejected the independent claims as obvious over Umabayashi in view of Unitt and further in view of Pfeiffer. *See* Appx0195-0198, Appx0382-0385. Umabayashi and Unitt disclose an access network, not a LAN. *See* Appx0238 ("As an example of application of Ethernet (R) technology to a subscriber access network, a point-to-multipoint PON (Passive Optical Network) configuration subscriber access network capable of reducing costs is drawing attention."); Appx5267 (¶ 38) (referring to "an exemplary FTTH access network"). Pfeiffer only tangentially mentions "an optical LAN." Appx3987. Eventually, the Applicant convinced the Examiner (via his supervisor) that the cited references did not disclose a LAN client for a passive optical LAN, as claimed, and the Examiner withdrew those rejections. *See* Appx0341-0345; Appx0765 ("[the] Examiner will withdraw the finality of the rejection. Examiner also informed the inventor/applicant that Examiner will update searches, and plan to cite two or more references in the next office action.").

### 3. Office Actions based on Husbands and Yuki

The next two Office actions rejected the independent claims as obvious over Husbands in view of Yuki. *See* Appx0772-0776, Appx3443-3449. The Examiner stated that Husbands did not expressly disclose the operations of the control module including the recited upstream and downstream control information. Appx0773-0774, Appx3445-3446. The Examiner relied on Yuki as disclosing dynamic bandwidth allocation. *See* Appx0775-0776, Appx3446-3449.

### a. Husbands

Husbands discloses a peer-to-peer network that uses CSMA/CD. *See* Appx3712 (2:29-31).

> *The network protocol selected for use with the local area network of the present invention is carrier sense multiple access (CSMA) with collision detection (CD).* The CSMA protocol has evolved from decentralized contention techniques. This protocol is designed to support a large number of bursty users on a time shared transmission medium. *This protocol features no central controller* and any terminal can initiate

communications to other terminals.  To accomplish this
task, the initiating terminal first listens to determine the
availability of the transmission medium.  If the line is
quiet, the source terminal sends out a command packet
followed by the message.

*Id.* (2:29-41) (emphasis added).

Husbands describes two prior art drawings, Figures 1 and 2, where any
terminal T can communicate with another through a repeater or star coupler
without a master.  Appx3707, 3713 (Figs. 1, 2; 3:2-52).  The "head-end repeater
R" of Figure 1 compensates for the different optical loss between near and far
terminals T.  Appx3713 (3:15-19).  Figure 2 uses a passive star coupler.  *Id.* (3:30-
33).



## FIG. 1
### ( PRIOR ART )

Appx3707.



# FIG. 2
(PRIOR ART)

*Id.*

Figure 3 introduces an improvement to the passive star coupler of Figure 2. Specifically, all transmitters T transmit to a fiber optic star 10, which combines the signals together. Appx3713 (3:60-61).



# FIG. 3

Appx3707. "The resulting signal is amplified and distributed through a second outbound star 12." Appx3713 (3:61-63). As illustrated in Figure 4, only receivers 32 and 84 and transmitters 30 and 82 are illustrated to propagate the signals. Appx3708. As described by Husbands:

> Each of the 8 ports on one side of the star couplers 26 and 28 are dedicated to terminal interconnections. On the other side of the star couplers, one port is terminated through a connecter ether to the optical receiver 32 or to the optical transmitter 30. Optical transmissions from a terminal 14 enter the input star coupler 26 and are detected by the receiver 32. The electrical output of this receiver 32 drives the head-end transmitter 30, which launches light back into the output star 28. This light is divided by the star 28 and broadcast to all of the terminals.

Appx3713 (4:19-30). This is the foundation of the operation in Husbands. A signal from a terminal enters a star coupler. One output of the star coupler is received by a receiver R, electrically transmitted to transmitter T, and split to all of the devices through the output star coupler. Figure 6 illustrates the

expandability of the network where a terminal is replaced with the dual star coupler of Figure 4. Appx3709, Appx3714 (5:15-16).



FIG. 6

Appx3709.

Figure 7 illustrates various devices in or attached to a node 46. *Id.* The activity detector 48 provides statistics and provides information to be displayed. Appx3714 (5:53-64).



*FIG. 7*

Appx3709. The babble detector 50 only "monitors the incident optical Manchester waveform of the packets and signals excessive collision counts. Appx3714 (5:64-6:2). The optical time domain reflectometer (OTDR) measures reflections to monitor continuity of the fiber optic cables. *Id.* (6:10-17). Finally, Husbands discloses a video distribution service that may be input into an auxiliary port 44. *Id.* (6:18-20). This is a way of transmitting a video channel to the terminals. *Id.* (6:21-25, 6:41-43).

Figure 8 illustrates a modification, namely, use of a star coupler 62 to use a single fiber between the star coupler and the terminals. Appx3710. The head-end receiver 66 merely receives transmissions and retransmits them back into

the star coupler 62 to operate bidirectionally.  Appx3715 (7:1-6).  Figure 9 is the

cascading of the devices of Figure 8 similar to that of Figure 6.  Appx3709-3710.

Finally, Figure 10 discloses a system similar to that of Figure 8 but with a change

in wavelength at the head-end node 74.  Appx3711, Appx3715 (7:48-54).

### b.    Yuki

Yuki is an access network that requires a master-slave relationship:

> The present invention relates to a point-to-multipoint
> stream communication system in which
> communication is performed between a single *master*
> unit and a plurality of *slave* units along a transmission
> line.

Appx3806 (1:6-8) (emphases added).  The slave units must receive that

permission from the master unit and only for an allowable amount of data that

may be transmitted:

> Each slave unit temporarily stores a signal and measures
> the amount of the signal information before
> transmitting the signal.  A master unit requests that
> slave units report the measured amounts of information,
> and they give reports to the master unit.  On the basis
> of the reports from the slave units, the master unit

> determines an allowable amount of information for each slave unit and permits the slave units to transmit the stored signals according to the request from the master unit.

Appx3717 (Abstract).

Yuki discloses that Figure 1 is "an optical access network." Appx3811 (11:58-59). Yuki only mentions a LAN in a single sentence: "Point-to-multipoint communication systems such as LANs, CATV networks, satellite communication networks, and optical subscriber access networks are commonly configured such that a master unit and a plurality of slave units communicate by sharing, for example, transmission lines such as those used in coaxial communication, optical-fiber communication, and radio communication." Appx3806 (1:17-23). Yuki is otherwise silent on the application of its protocol to a LAN.

Yuki discloses a variety of protocols that may be applied, none of which is CSMA/CD:

> Although the first to fifth embodiment aspects above were described with reference to cases in which TDM and TDMA were used as cell multiplexing protocols, the access protocol in accordance with the present

invention can be easily adapted, for example, to FDM
(Frequency Division Multiplex), FDMA (Frequency
Division Multiple Access), CDMA (Code Division
Multiple Access), and the like.

Appx3820 (29:65-30:4). Yuki repeatedly mentions CSMA/CD but does not
disclose that CSMA/CD may be adapted for use with his system.

### C.   Proceedings Before the Board

The Board affirmed the Examiner's final rejections based on Husbands in
view of Yuki. Appx0002. The Soto brothers argued that "Husbands is a peer-to-
peer network, not a master slave network as in Yuki" and "features no central
controller." Appx3528. They also argued that "Yuki requires a master that
manages the network." Appx3530. The Board was "unpersuaded by Appellant's
argument regarding the alleged distinction between Husbands' [sic] peer-to-peer
system (without a central controller) and Yuki's point-to-multipoint system."
Appx0014-0015. The Board's rationale was, in part, that Yuki is "directed to an
optical local area network (LAN)." Appx0015 (citing Yuki, 1:16-23 [Appx3806].)
Yuki's only mention of a LAN in 132 pages is in that single sentence. Yuki

discloses that "the point-to-multipoint communication system shown in FIG. 1 is configured as an optical access network." Appx3811 (11:58-59).

The Board was "unpersuaded by Appellant's argument regarding the alleged incompatibility between Yuki's access protocol and Husbands' [sic] access protocol." Appx0015. First, the Board found that "Yuki's access protocol and Husbands' [sic] access protocol are directed to overcoming problems with CSMA/CD." Appx0015. Husbands "selected [carrier sense multiple access (CSMA) with collision detection (CD)] for use with the local area network of the present invention." Appx3712 (2:29-31.). "[CSMA/CD] features no central controller and any terminal can initiate communications to other terminals." *Id.* (2:35-37). Husbands's objects of the invention included "a local area network which is light in weight for portability . . . a local area network capable of supporting a wide variety of terminal devices for data services [and] a local area network which is expandable in a modular fashion to permit the interconnection of numerous terminal users." *Id.* (1:45-54). Problems identified in Husbands included "optical power loss associated with cascading couplers" (Appx3713 (3:7-8)), "the dynamic range requirements imposed on some of the optical receivers

in the system" (*id.* (3:12-15), and "manufacturing variability in larger star couplers" (*id.* (3:46-49).

The Board then found that "Yuki's TDM (Time Division Multiplex) and TDMA (Time Division Multiple Access) are known to be interchangeable with and "easily adapted, for example, to FDM (Frequency Division Multiplex), FDMA (Frequency Division Multiple Access), CDMA (Code Division Multiple Access), and the like." Appx0015. CSMA/CD is not listed in the passages of Yuki cited by the Board to which Yuki's protocol may be "easily adapted." Appx0015; *see also* Appx3820 (29:65-30:4), Appx3826 (42:46-52).

The Board agreed with the Examiner that "a person of ordinary skill in the art [would be motivated] to achieve the claimed subject matter, *i.e.*, 'to apply the dynamic bandwidth allocation approach as taught by Yuki . . . to the system/method of Husbands . . . so that . . . the buffer memory requirements can be relaxed, and the latency time elapsed before a slave/client unit transmits a signal can be reduced, and system capacity/throughput can be increased.'" Appx0016. The Board found that "Appellant's arguments regarding (1) the alleged distinction between Husbands' [sic] peer-to-peer system (without a

central controller) and Yuki's point-to-multipoint system, (2) the alleged incompatibility between Yuki's access protocol for use in TDM, TDMA, CDMA, FDM, and FDMA and Husbands' [sic] network that uses CSMA/CD are not commensurate in scope with claim 1." Appx0014. The Board also found "that Appellant's arguments do not point to any specific language within the claims to distinguish over the prior art." Appx0015.

The Board did not address the argument that "Husbands is a peer-to-peer network, not a master slave network as in Yuki" or that "Yuki requires a master that manages the network." Appx3528-3531, Appx3618. The Board also did not address the argument that "the operation of Yuki makes the terminals of Husbands unsuitable for their intended purpose." Appx3530.

## IV. SUMMARY OF ARGUMENT

The Board based its decision on several findings that are not supported by substantial evidence. Those unsupported findings include (1) finding that Yuki is directed toward an optical LAN, (2) finding that Yuki's protocol could be applied to a CSMA/CD; (3) finding that Husbands is directed towards overcoming problems with CSMA/CD; and (4) finding that one skilled in the art would apply

master-slave teachings to a peer-to-peer system. Those findings undergird the Board's obviousness conclusion. But, none of those findings have substantial-evidence support in the record.

In fact, one skilled in the art looking at Husbands and Yuki, considering both as a whole and without knowledge of the Soto brothers' claims, would reach the opposite conclusions on those points. Yuki is an access network. Husbands is not. Yuki requires a master-slave architecture. Husbands is peer-to-peer. The collisions in Husbands are a result of the freedom of a terminal to initiate communications to other terminals. Yuki eliminates that freedom. Yuki may be adapted to multiple protocols, none of which are the one Husbands specifically chose to use. Husbands does not have the hardware to implement Yuki's protocol. All of these objective signposts within the four squares of the documents themselves point away from the Husbands-Yuki combination that the Board relied upon to find the claims obvious.

Modifying Husbands's peer-to-peer communication system with Yuki's master-slave communication system would require substantial reconstruction and would render Husbands inoperable for its intended purpose, as the Soto

brothers pointed out to the Board. The Board disregarded these arguments. Specifically, the Board dismissed those arguments as not being commensurate with the claims. That was error. Those arguments relate directly to whether the proposed Husbands-Yuki combination would have been obvious – regardless of what the claims say. The Board simply misapprehended the role of the claims in a proper obviousness analysis premised on a combination of references.

## V.  ARGUMENT

### A.  Standards of Review

Obviousness is a legal conclusion based on underlying facts. *See Belden Inc. v. Berk-Tek LLC*, 508 F.3d 1064 (Fed. Cir. 2015). The underlying factual determinations are reviewed for substantial evidence, while the overall conclusion of obviousness is reviewed *de novo*. *Id.* "Whether a motivation to combine prior art references has been demonstrated is a question of fact." *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1351 (Fed. Cir. 2001). Whether one of ordinary skill in the art would have had a reasonable expectation of success to combine the prior art references is also a question of fact. *OSA Pharms, LLC*

*v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019); *see also Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1345 (Fed. Cir. 2020) (same).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938). "[S]ubstantial evidence review requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion." *Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1356 (Fed. Cir. 2018) (quotation marks and citations omitted).

Although the substantial-evidence standard of review may be somewhat deferential, the Supreme Court "has stressed the importance of not simply rubber-stamping agency factfinding" while reminding that judicial review of agency fact finding must be "meaningful." *Dickinson v. Zurko*, 527 U.S. 150, 162, 119 S. Ct. 1816, 1823 (1999) (citations omitted). Thus, this court has explained, "Though our review [under the substantial-evidence standard] is deferential, we have not hesitated to reverse the Board when substantial evidence does not support its findings." *In re Chudik*, 851 F.3d 1365, 1371 (Fed. Cir. 2017)

### B. The Board's Findings in Support of Combining Husbands and Yuki Are Not Supported by Substantial Evidence.

The Board's decision rests on multiple conclusions that are not supported by substantial evidence. First, the Board concluded that Yuki is directed to an optical LAN, but Yuki is directed to an access network, not a LAN. Second, the Board concluded that Yuki's protocol could be adapted to the CSMA protocol of Husbands, but no evidence shows the application of Yuki's protocol to a CSMA-based system. Third, the Board concluded that Husbands is directed to overcoming problems with CSMA/CD, but that is simply not true. That reflects a misunderstanding of Husbands, which specifically selected CSMA/CD for operation notwithstanding its supposed problems. Fourth, the Board found that Yuki's master-slave scheme could be applied to Husbands's master-slave system, but no evidence supports that. Each of these unsupported findings is necessary to the Board's ultimate conclusion that one skilled in the art would have found it obvious to combine the teachings of Yuki and Husbands to arrive at the claimed subject matter. Without these predicate findings, however, the Board's obviousness conclusion cannot stand.

### 1. Yuki Does Not Disclose an Optical LAN.

The Board cited one sentence in Yuki to support its finding that Yuki is directed towards a LAN, but that single sentence is not sufficient for a reasonable mind to find that Yuki is directed towards a LAN. Specifically, the Board found that "Yuki [is] directed to an optical local area network (LAN)." Appx0015 (citing Appx3806 (1:16-23)). This is incorrect. Yuki is not directed to an optical LAN.

The Board declared that "Yuki teaches a point-to-multipoint communication system such as an optical LAN, shown in Figure 1." Appx0011. Yuki, however, expressly and clearly describes Figure 1 as "an optical access network," not a LAN. Appx3811 (11:58-59). Yuki's only mention of a LAN is a single reference in the background: "Point-to-multipoint communication systems such as LANs" is the only reference to a LAN. Appx3806 (1:16-17). Yuki never refers to a LAN when describing the protocols that the Board relied upon to reject the claims.

In an access network, data flows in a downstream direction from a head-end to terminals and in an upstream direction from the terminals to the head end. Appx4000 (3:44-51). The head-end and terminals are not peer entities. *Id.*

(3:54-58). This matches the upstream and downstream direction of data in Yuki. *See* Appx3721, Appx3811 (Fig. 4, 12:43-59 (describing the upstream and downstream transmission frames)).

Compare an access network from Figure 1 of ITU-T G.983.1 and Figure 1 of Yuki:



| ONU | Optical Network Unit |
| ONT | Optical Network Termination |
| OLT | Optical Line Termination |
| NT | Network Termination |

**Figure 1/G.983.1 – Network architecture**

Appx0823.

# FIG.1



Appx3718. As can be seen, Yuki's self-described access network in his Figure 1 fits in exactly in the access network of an OLT and ONUs according to the ITU.

Yuki's self-described access network in his Figure 1 also fits in exactly in the access network of an OLT and ONUs of Figure 7C of Song:



FIG. 7C

Appx5286. The only difference between Yuki's access network and the access network of Song and ITU-T G.983.1 is that the OLT and ONUs are labeled master unit and slave units in Yuki.

In contrast, a distinguishing feature of LANs is a "that total connectivity is achieved" in a LAN. Appx0985. In a typical LAN, all of the nodes are peers for purposes of communicating. This is reflected in Husbands's expressly labeled LAN where "any terminal can initiate communications to other terminals." Appx3712 (1:7-8 and 2:36-37). Any node in a LAN can communicate with any other node in the LAN, and it is typically possible for a node to send a single

message that can be received by all other nodes. Thus, it may be true, as Yuki states, that "[p]oint-to-multipoint communication" is possible in a LAN. "Point-to-multipoint communication" is also possible in an access network, but only for the head-end as the point and the terminals as the multipoints. That mere coincidence does not in any way signify that an access network is a LAN. The Board's conclusion that Yuki's "optical access network" is a LAN therefore appears to be based on a misunderstanding of Yuki, in particular a misreading of the one sentence in Yuki's background mentioning LANs and "[p]oint-to-multipoint communication systems."

Accordingly, there is insufficient evidence for a reasonable mind to find that Yuki is directed towards a LAN. Thus, the Board's unsupported finding that Yuki is directed towards a LAN cannot be used as the rationale (or even part of the rationale) to combine Yuki with Husbands. Yet, that is exactly what the Board did. The Board based its rationale to combine Yuki and Husbands on the false premise that Yuki is a LAN. That is reversible error.

## 2. No Evidence Supports Applying Yuki's Protocol to a CSMA/CD-Based System.

The Board adopted the Examiner's argument that Yuki's protocol could be adapted to a CSMA/CD system. *See* Appx3442, Appx3448. Specifically, the Board found that "Yuki's TDM (Time Division Multiplex) and TDMA (Time Division Multiple Access) are known to be interchangeable with and 'easily adapted, for example, to FDM (Frequency Division Multiplex), FDMA (Frequency Division Multiple Access), CDMA (Code Division Multiple Access), and the like.'" Appx0015(quoting Yuki at 29:65-30:4 (Appx3820)).

However, none of the various protocols that Yuki's protocol may be adapted to, according to the Board, is CSMA/CD.[1] Yuki never describes his protocol as CSMA/CD, even though Yuki was fully aware of CSMA/CD. In fact, Yuki clearly and unambiguously **_distinguishes_** his various embodiments from CSMA/CD.

---

[1] C**D**MA is not related to, and certainly not the same thing as, C**S**MA or CSMA/CD. Not even close.

For example, Yuki's Figure 17 compares an embodiment of Yuki's access protocol with "access protocols of conventional TDMA or CSMA/CD." Appx3815 (20:40-44). Similarly, Yuki's Figure 18 compares "the access protocol of the first embodiment aspect of the present invention and according to access protocols based on conventional TDMA and CSMA/CD." *Id.* (20:56-58). Same for Figure 20. *See* Appx3816 (22:48-51) ("FIG. 20 depicts the results of a comparison between the access protocol based on the second embodiment aspect of the present invention and access protocols based on conventional TDMA and CSMA/CD."). Same for Figure 21. According to Yuki, the results of Figure 21 are "obtained using the same simulation" as Figure 20 showing the results of the second embodiment. Appx3817 (23:9-16). Finally, Yuki introduces Figures 27 and 28 as "a description of comparison results obtained by simulating access protocols based on conventional TDMA and CSMA/CD, and an access protocol based on the fourth embodiment aspect of the present invention described above." Appx3819 (28:28-32).

In spite of clear knowledge of CSMA, Yuki never discloses that Yuki's protocol is or may be adapted to a CSMA/CD-based system. Understandably so,

as there are fundamental differences between a CSMA/CD and the other protocols:

> [The CSMA] protocol features no central controller and any terminal can initiate communications to other terminals. To accomplish this task, the initiating terminal first listens to determine the availability of the transmission medium. If the line is quiet, the source terminal sends out a command packet followed by the message.

Appx3712 (2:35-41). In CSMA/CD, collisions are both inherent and detected to control access:

> Because of inherent delays in the transmission medium, two terminals located some distance from one another can initiate almost simultaneous transmissions based on each hearing a quiet line. This simultaneous transmission creates a collision on the line, producing garbled data.

*Id.* (2:49-54). After data is garbled by a collision, the data must be retransmitted. *Id.* (2:54-58).

Frequency-division or code-division systems allow for simultaneous transmission. For example, in CDMA "a signal string characteristic for each optical network unit ONU is generated so that all signal strings can be detected even in the event that there is an overlap between several signal strings received simultaneously at the center OLT." 4010 (4:41-46). CDMA "*permits several transmissions to occur simultaneously* within the same bandwidth, with the mutual interference reduced by the degree of orthogonality of the unique codes used in each transmission." Appx4154 (emphasis added). With FDMA, multiple distinct frequency portions are used to allow simultaneous communications so that "*two or more simultaneous, continuous channels* from a propagation medium by assigning separate portions of the available frequency spectrum to each of the individual channels." Appx4411 (emphasis added).

In a TDMA, time is divided into discrete time intervals in a common channel and assigned to "two or more concurrent channels … by assigning discrete time intervals, in sequence, to each of the derived channels." Appx5061-5062. While TDMA does not technically permit simultaneous transmissions at the same instant, it does so effectively over a long period of time.

What these three multiple-access techniques (CDMA, FDMA, and TDMA) have in common is that multiple nodes can use the communication channel at the same time (literally or effectively) without collisions. This is in stark contrast to CSMA, where the one channel (the one carrier) is wholly and entirely used by one node at a time, where access is governed by a listen-first-and-talk-only-if-the-channel-is-unused protocol. CSMA/CD further detects collisions when two nodes start to talk at the same time and typically manages that by having each node wait a random time before attempting to talk again.

What is clear – and what should have been clear to the Board – is that CSMA/CD is not the same as either CDMA, FDMA, or TDMA. Yuki's teaching that Yuki's protocol could be adapted to CDMA, FDMA, or TDMA is *not* a teaching that Yuki's protocol could be adapted to CSMA/CD, a completely different protocol. There is no evidence whatsoever – certainly not in Yuki – that Yuki's system could be adapted for use is a CSMA system, like the CSMA system of Husbands.

Yet the Board's rationale to combine Yuki and Husbands was based in part on the wholly unsupported finding that Yuki's protocol may be applied to the CSMA/CD based system of Husbands. That is reversible error.

### 3. Husbands is Not Directed at Overcoming Problems with CSMA/CD.

The Board found that "both Yuki's access protocol and Husbands' [sic] access protocol are directed to overcoming problems with CSMA/CD." Appx0015. Wrong. Husbands is not directed to overcoming problems with CSMA/CD. Rather, Husbands specifically selected CSMA/CD as the protocol to be used in Husbands's system: "The network protocol selected for use with the local area network of the present invention is carrier sense multiple access (CSMA) with collision detection (CD)." Appx3712 (2:29-31). There is no evidence to support the Board's erroneous finding that Husbands was directed to overcoming problems with CSMA/CD. There is not even any evidence to suggest that Husbands was at all concerned about any potential problems with CSMA/CD. Problems identified in Husbands included "optical power loss associated with cascading couplers" (Appx3713 (3:7-8)), "the dynamic range requirements imposed on some of the optical receivers in the system" (*id.* (3:12-

15), and "manufacturing variability in larger star couplers" (*id.* (3:46-49). To be sure, Husbands identifies no problems with CSMA/CD. Nor, perforce, does Husbands propose any solutions to those non-existent problems with CSMA/CD. Husbands's objects of the invention included "a local area network which is light in weight for portability . . . a local area network capable of supporting a wide variety of terminal devices for data services [and] a local area network which is expandable in a modular fashion to permit the interconnection of numerous terminal users." Appx3712 (1:45-54).

Yet the Board baldly asserted that "both Yuki's access protocol and Husbands' [sic] access protocol are directed to overcoming problems with CSMA/CD." Appx0015. The Board identified no specific problem with CSMA/CD that Husbands allegedly is directed at overcoming. Nor, of course, did the Board identify how Husbands's access protocol would overcome any alleged problems with CSMA/CD. That is because Husbands's access protocol *is* CSMA/CD. It makes no sense that Husbands would use CSMA/CD to overcome problems with CSMA/CD, but that is literally how the Board's fallacious reasoning unwraps.

Again, this is significant because the Board's conclusion that one skilled in the art would have found it obvious to combine Yuki and Husbands was based in part on this false and wholly unsupported finding that "Husbands' [sic] access protocol are directed to overcoming problems with CSMA/CD" (in addition to several other false and wholly unsupported findings as explained above and below in this brief). Appx0015.

### 4. No Evidence Supports Applying a Master-Slave Protocol to a Peer-to-Peer System.

No evidence supports adding Yuki's master-slave-based teachings into Husbands peer-to-peer system. Yuki requires a master-slave system. Yuki says nothing about the applicability of his protocol to a peer-to-peer system. The broadest statements of applicability in Yuki always includes a master: "[The] present invention is also widely applicable to communication systems composed of a *master* unit and a plurality of *slave* units." Appx3811 (11:64-66) (emphases added). "Other possible applications include … a plurality of wireless terminals are connected instead of *slave* units to the *master* unit by means of a wireless transmission line." *Id.* (12:1-6) (emphasis added).

The Examiner's rationale, adopted by the Board, expressly requires a "slave/client unit" of Yuki and implicitly requires a master. Appx0016. The Examiner argued that the point-to-multipoint system of Yuki was widely applicable to systems with a master unit and slave units. Appx3443. However, substantial evidence does not support adding Yuki's master-slave protocol into Husbands's peer-to-peer system. Whereas Yuki's protocol requires a master-slave relationship, Husbands has a peer-to-peer system. The Board ignored this fundamental difference. Appx0014-0015. No reference or other evidence, outside of conclusory statements by the Examiner, even hints at using a master-slave protocol in a peer-to-peer system.

Because the Board's rationale to combine Husbands and Yuki depends on applying master-slave teachings to a peer-to-peer system, and because – again – there is no evidence to support that, the Board's obviousness conclusion was reached in error and should be reversed.

## C.  Modifying Husbands With Yuki Would Require a Substantial Reconstruction and Render it Inoperable for its Intended Purpose.

The Board concluded that "the Examiner has provided a rationale supporting motivation by a person of ordinary skill in the art to achieve the

claimed subject matter, *i.e.*, 'to apply the dynamic bandwidth allocation approach as taught by Yuki . . . to the system/method of Husbands . . . so that . . . the buffer memory requirements can be relaxed, and the latency time elapsed before a slave/client unit transmits a signal can be reduced, and system capacity/throughput can be increased.'" Appx0016.

Necessarily, the incorporation of Yuki into Husbands would require a conversion to a master-slave system. Yuki requires a master that manages the network. The slave units issue reports on an amount of data needed. Appx3806 (2:21-23). The master unit instructs the slave units on a maximum number of bits that may be transmitted. *Id.* (2:23-27). Notions of master and slave repeatedly appear in Yuki. For example, the technical field is "system in which communication is performed between a single *master* unit and a plurality of *slave* units." *Id.* (1:6-9) (emphases added).

Husbands is a peer-to-peer system. Husbands network uses the CSMA/CD protocol. Appx3712 (2:29-31). "***This protocol features no central controller*** and any terminal can initiate communications to other terminals." *Id.* (2:35-37) (emphasis added).

Husbands's architecture focuses on the operation of a single peer. The whole structure of the improved system in Husbands is such that one peer, wherever it is in the network, will transmit the same power to every other node. The problem with the prior art, according to Husbands, was the variability in power levels and the requirements imposed on a repeater. Figure 1 of Husbands shows that in the prior art there was increasing power loss with cascading couplers and an associated requirement that the repeater R handle the variable power from the closest and most distant transmitter T. Appx3713 (3:7-19). Husbands's Figure 2 shows prior art with better balance but limited expandability and recirculation problems. *Id.* (3:46-53). Figure 3 shows Husband's solution, which is balanced and expandable. *Id.* (3:68-4:2). Subsequent embodiments build on this with connectivity to accommodate expansion. *Id.* (3:66-68 and 4:65-67). The net result is an architecture that enable any peer to initiate communication with another peer.

"[A] proposed modification [is] inappropriate for an obviousness inquiry when the modification render[s] the prior art reference inoperable for its intended purpose." *In re Fritch*, 972 F.2d 1260, 1265 n.12 (Fed. Cir. 1992) (citing

*In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984)). But, the Board's modification of Husbands based on the teachings of Yuki fundamentally changes how the terminals may initiate communications. Before the combination, the terminals in Husbands may independently initiate communications to another terminal. After the combination, the terminals must ask permission from the master unit to transmit. Moreover, after the combination, the terminals may only communicate with the master unit, not the slave units. Yuki does not appear to contemplate slave-to-slave communications. That is in direct conflict with Husbands's express feature that any terminal may initiate communications with another terminal. Appx3712. This is not merely a reduction in the performance of this feature; rather, it is a complete elimination of this feature. If a master or central controller is required, as it is in Yuki, then Husband's feature that no central controller is required and any terminal can initiate communications with another terminal is eliminated.

Moreover, a modification or combination must not "require a substantial reconstruction and redesign of the elements" in a reference or "a change in the basic principles under which [a reference] was designed to operate." *In re Ratti*,

270 F.2d 810, 813 (CCPA 1959). Yet, the operation of Yuki requires a substantial reconstruction of Husbands, as the two systems operate according to fundamentally different principles (*e.g.*, peer-to-peer vs. master-slave). Moreover, a master-slave network required by Yuki necessarily needs some processing, but the nodes of Husbands themselves have none. Husbands's transmitters and receivers are merely repeaters.

There is no evidence that any of the various terminals attached to a head-end in Husbands would have been modified by one skilled in the art to act as a master to implement Yuki's protocol. For example, the activity detector 48 provides statistics and provides information to be displayed. Appx3714 (5:53-64). The babble detector 50 only "monitors the incident optical Manchester waveform of the packets and signals excessive collision counts. *Id.* (5:64-6:2). The optical time domain reflectometer (OTDR) measures reflections to monitor continuity of the fiber optic cables. *Id.* (6:10-17). Finally, Husbands discloses a video distribution service that may be input into an auxiliary port 44, but this is merely a way of transmitting a video channel to the terminals. *Id.* (6:18-25, 6:41-43). No device has any network control functionality.

To incorporate Yuki's master into Husbands would require substantial reconstruction of the otherwise uninvolved nodes of Husbands. The existing nodes of Husbands would need additional processing and/or the existing devices, such as the activity detector or babble detector, would need to be modified to act as a master.

Overall, the Board erred by failing to recognize that it would not have been legally obvious to combine Husbands and Yuki as the Examiner proposed because of the important and fundamental technical differences between them.

### D. The Board Erred by Disregarding Arguments and Ignoring Evidence.

Not only did the Board make factual findings unsupported by evidence and other errors in its obviousness analysis, it also ignored some of the Soto brothers' arguments and evidence. The Board did so regarding (1) distinctions between master-slave and peer-to-peer systems, as set forth in § V-B-4 *supra* at 46-47, and (2) the feature of Husbands (free initiation of communication by any terminal) that would have been eliminated by the use of Yuki's protocol, as set forth in § V-C *supra* at 47-52.

While the Board acknowledged and recounted the Soto brothers' arguments, *see* Appx0011-0013, the Board did not address arguments regarding (1) and (2), *see* Appx0014-0015 (part of Board decision with Board's reasoning, not addressing either the master-slave/peer-to-peer distinctions or the argument that the Husbands-Yuki combination would render Husbands inoperable for its intended purpose). Failure by the Board to address a party's argument is error and grounds for at least vacatur and remand. *Cf. Cutsforth, Inc. v. MotivePower, Inc.*, 636 F. App'x 575, 578 (Fed. Cir. 2016) ("Merely reciting [a party's] argument does not satisfy the Board's responsibility to explain its own reasoning. The decision must explain why a person of ordinary skill in the art would find it obvious. The Board gives no such explanation."); *Paice LLC v. Ford Motor Co.*, 881 F.3d 894, 905 (Fed. Cir. 2018) (citing *Cutsforth* with approval); *In re Nuvasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016) (same). The Board's failure here is even worse than in *Cutsforth*, where the Board's decision summarized the position of a party ***with whom it agreed***, without supplying its own reasoning. Here, the Board summarized the appellant's arguments and then ***disagreed***, concluding "Appellant's contentions are not persuasive to demonstrate reversible error" without providing any reasoning to reject the Soto brothers' arguments.

Appx0014. That was contrary to the requirements for an opportunity to be heard and a reasoned explanation of the agency's decision. *See* 5 U.S.C. §§ 554(c)(1), 556(c)(3)(A); *see also In re Lee*, 277 F.3d 1338, 1342-45 (Fed. Cir. 2002) (vacating Board's decision that claims were obvious due to holes in the administrative record); *In re Nuvasive*, 842 F.3d 1376, 1382-84 (Fed. Cir. 2016) (same).

Not only did the Board make factual findings unsupported by evidence and disregard the Soto brothers' arguments, it also ignored contrary evidence put forward by them regarding the distinction between a master-slave system and a peer-to-peer system. *See* Appx3527-3530 (raising those distinctions in appeal brief and pointing out specific passages in Yuki and Husbands). The Soto brothers' briefing on this issue before the Board was not just attorney argument but also included evidence in the form of parts of Yuki and Husbands supporting the brothers' points. Yet, the Board addressed none of that evidence. That too was error. *See, e.g., Polaris Indus. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1061, 1067–69 (Fed. Cir. 2018) (vacating Board decision that failed to consider whether modifying prior art reference would undermine its goal); *see also Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 970 (Fed. Cir. 2015)

(explaining that although "Board is not required to discuss every piece of evidence," it cannot "disregard [evidence] without explanation" or "short-cut its consideration of the factual record before it").

E.     The Board Erroneously Dismissed Relevant Arguments About the Nonobviousness of Combining Husbands and Yuki as "Not Commensurate in Scope With" or Not Tied to Specific Language of the Claims.

Another error that pervades the Board's obviousness analysis is its repeated dismissal of relevant arguments made by the Soto brothers as unconnected to the claim language. *See* Appx0014 (dismissing arguments about the differences between Yuki and Husbands as "not commensurate in scope with claim 1"). The Board made this point, for example, as follows:

> More importantly, we note that the Applicant's arguments do not point to any specific language within the claims to distinguish over the prior art (Husbands and Yuki) and, as such those argument amount to a general allegation that the claims define a patentable invention. Such allegations will not be considered an argument for separate patentability.

Appx0015.  These statements reflect a profound misunderstanding of the issues before the Board in this case.

The Board's fixation with the claim language would be appropriate if the Soto brothers disputed whether features of Husbands and Yuki in their proposed combination were within the scope of the claims.  But that was never the issue in this appeal.  The Board's fixation with the claim language would be especially appropriate if the Soto brothers argued that Husbands and Yuki do not teach or suggest "X."  That kind of argument certainly must be commensurate with the scope of the claims (*i.e.*, X must be a feature recited in the claims).[2]  But that is not this case.

The Soto brothers did not dispute that the proposed combination of Husbands and Yuki – *if that would have been obvious to one skilled in the art* –

--------------------

[2] Other issues sometimes implicated in an obviousness analysis, such as unexpected results or secondary considerations, may also rightfully relate to the scope of the claims, but not the core issue of the obviousness of combining a given set of references.

would satisfy the claim limitations. The Board seemed to recognize this. *See* Appx0012 ("Appellant does not dispute the Examiner's factual findings regarding Husbands and Yuki individually. Instead, Appellant presents several arguments against the combination of Husbands and Yuki." (citations omitted)). Yet, the Board lost sight of the real issue, which was whether one of ordinary skill in the art would have found it obvious to combine the teachings of Husbands and Yuki as the Examiner proposed. *That* issue does not turn on what the claims say or do not say. *That* issue turns on features of the *references*, such as whether those features are compatible, whether those features are in conflict, whether those features are combinable with a reasonable expectation of success, whether the two references concern the same type of network, whether the references use or can use the same protocols, whether the references use the same communications scheme, whether the combination would destroy render a reference inoperable for its intended purpose, whether the combination would require a substantial redesign of a reference, etc.

Thus, for example, the question whether one skilled in the art would have replaced Husbands's CSMA/CD protocol with Yuki's TDMA, CDMA, or FDMA

protocols is relevant, not because the claims recite a particular protocol (they don't) but because those references use different protocols and the obviousness of replacing one protocol with another is at the heart of the obviousness question in this case. Similarly, the question whether one skilled in the art would have modified Husbands's peer-to-peer scheme with Yuki's master-slave scheme is also relevant, not because the claims refer to peer-to-peer or master-slave, but because those references use different schemes and the obviousness of replacing one scheme with another is also at the heart of the obviousness question in this case. Same for the question of whether both references concern an optical access network. Same for the question of whether both references are directed at solving problems with CSMA/CD. Same for the questions whether the proposed combination would render Husbands inoperable for its intended purpose or require a wholesale redesign.

This is not to say that the claim language is irrelevant. The claims at issue recite specific language. To meet that language, the Examiner selected two particular references, each with particular teachings, and contended that one skilled in the art would have found it obvious to combine those references in a

particular way to result in all the claimed limitations. At that point, it certainly became relevant whether the teachings of the two references are in conflict, whether they could be combined with a reasonable expectation of success, etc.

It is an elementary tenet of patent law that simply finding a set of prior art references collectively having all of a claim's limitations does not by itself establish obviousness:

> An invention is not obvious simply because all of the claimed limitations were known in the prior art at the time of the invention. Instead, we ask "whether there is a reason, suggestion, or motivation in the prior art that would lead one of ordinary skill in the art to combine the references, and that would also suggest a reasonable likelihood of success."

*Forest Labs., LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 934, (Fed. Cir. 2019).

> Obviousness requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination. Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those

prior art elements in the normal course of research and
development to yield the claimed invention.

*Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011).

Moreover, "§ 103 does not permit a court to stitch together an obviousness
finding from discrete portions of prior art references without considering the
references as a whole." *In re Enhanced Sec. Rsch., LLC*, 739 F.3d 1347, 1355
(Fed. Cir. 2014); *see also Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1166
(Fed. Cir. 2006) ("the prior art must be considered as a whole for what it
teaches.").

The Board seems to have lost sight of these basic principles. As a result, it
was error for the Board to duck the relevant questions about the combinability
of Husbands and Yuki.

### F.     The Board Erroneously Relied on Hindsight.

The Board concluded that "the evidence shows that the proffered
combination is merely a 'predictable use of prior art elements according to their
established functions[, i.e., substituting Yuki's access protocol with Husbands's
access protocol].'" Appx0017 (alteration by Board). However, when Husbands

and Yuki are properly understood as supported by the evidence, the rationale to combine the two collapses.

In particular, the Board alleged that Husbands and Yuki were compatible as Yuki is directed to an optical LAN. Appx0015. As explained in § V-B-1 *supra* at 34-38, Yuki is not directed towards an optical LAN. The Board alleged that Husbands is directed towards overcoming problems with CSMA. *Id*. As explained in § V-B-3 *supra* at 44-46, Husbands is not directed towards overcoming problems with CSMA. The Board alleged that Yuki's protocol could be adapted to CSMA. As explained in § V-B-2 *supra* at 39-43, no evidence shows that Yuki's protocol could be adapted to CSMA.

As explained in § V-E *supra* at 55-60, the Board dismissed arguments as not commensurate with the scope of the claims. Dismissing arguments related to the combination of references based on what is allegedly not in the claims necessarily uses the claims as a roadmap. The Board should have evaluated the prior art as a whole, without filtering out arguments based on the claims. Without hindsight, the Board should have assessed Husbands and Yuki and considered what reasons one skilled in the art would have had to make or not make the combination

proposed by the Examiner.  Instead, what the Board did was to take the reasons to make or not to make a combination, filter out ones based on what is allegedly not in the claims, and look at the remainder to make the combination.  That was error.

Consider one skilled in the art looking at Husbands and picking up Yuki and considering both as a whole and without knowledge of the Soto brothers' claims.  Yuki is an access network.  Husbands is not.  Yuki requires a master-slave architecture.  Husbands is peer-to-peer.  The collisions in Husbands are a result of the freedom of a terminal to initiate communications to other terminals.  Yuki eliminates that freedom.  Yuki may be adapted to multiple protocols, none of which are the one Husbands specifically chose to use.  Husbands does not have the hardware to implement Yuki's protocol.   All of these objective signposts within the four squares of the documents themselves point away from the combination.

Yet, the Board found this combination of Husbands and Yuki would have been obvious to one skilled in the art.  How?  The only reasonable answer appears to be that the Board let the insidious creep of hindsight taint its analysis.

However, the combination must be made without the claims as a guide, without hindsight. *See KSR Int'l v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) (cautioning against "the distortion caused by hindsight").

To guard against hindsight, a reason to combine teachings from the prior art must come from the knowledge of an ordinarily skilled artisan, not the applicant's teachings. Moreover, "[t]he showing of a motivation to combine must be clear and particular, and it must be supported by actual evidence." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1334 (Fed. Cir. 2002). "To render a claim obvious, prior art cannot be 'vague' and must collectively, although not explicitly, guide an artisan of ordinary skill towards a particular solution." *Unigene*, 655 F.3d at 1361. The showing of motivation "must be clear and particular, and broad conclusory statements about the teaching of multiple references, standing alone, are not 'evidence.'" *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1125 (Fed. Cir. 2000).

Here, however, there is no clear, particular, evidence-supported, non-vague, non-conclusory support for the reasons to combine Husbands and Yuki as proposed by the Examiner.

## VI.  CONCLUSION

For the foregoing reasons, the Board's decision on appeal affirming the

Examiner's rejection of claims 1-24 of the '794 Application should be reversed.

Respectfully submitted,

Date: *Feb. 29, 2024*          By: */s/ Derek Meeker*

Derek Meeker
LAURENCE & PHILLIPS IP LAW
1050 Connecticut Ave., N.W., Suite 500
Washington, D.C. 20036
Phone:  360-606-8922
Fax:  202-558-6181
dmeeker@lpiplaw.com

*Counsel for Appellants*

# ADDENDUM

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

*Ex parte* ALEXANDER IVAN SOTO and WALTER GLENN SOTO

_____

Appeal 2023-000477
Application 17/138,794[1]
Technology Center 2600

_____

Before ERIC B. CHEN, HUNG H. BUI, and MICHAEL J. ENGLE,
*Administrative Patent Judges.*

BUI, *Administrative Patent Judge.*

DECISION ON APPEAL

Appellant seeks our review under 35 U.S.C. § 134(a) from the
Examiner's final rejection of claims 1–24. Appeal Br. 1–7 (Claim App.).
We have jurisdiction under 35 U.S.C. § 6(b). An oral hearing was held on
March 23, 2023. A transcript of the oral hearing will be made of record in
due course.

We affirm.[2]

_____

[1] "Appellant" refers to "applicant[(s)]" as defined in 37 C.F.R. § 1.42. The
named inventors are the real parties of interest. Appeal Br. 1.
[2] Our Decision refers to Appellant's Appeal Brief filed August 4, 2022
("Appeal Br."); the Reply Brief filed November 9, 2022 ("Reply Br."); the
Examiner's Answer mailed September 9, 2022 ("Ans."); the Final Office
Action mailed February 2, 2022 ("Final Act."); and the original
Specification filed December 30, 2020 ("Spec.").

STATEMENT OF THE CASE

*Related Proceedings*

The instant application is related to Appeal 2009-006986 in U.S. Pat. App. No. 10/886,514, now **U.S. Pat. No. 7,925,162 B2**.

The instant application is also a continuation of U.S. Pat. App. No. 16/886,479, filed May 4, 2020, now **U.S. Pat. No. 10,917,176 B2**, which is a continuation of U.S. Pat. App. No. 16/734,270, filed January 3, 2020, now **U.S. Pat. No. 10,644,802 B1**, which is a continuation of U.S. Pat. App. No. 14/588,899, filed January 2, 2015, now **U.S. Pat. No. 10,892,828 B2**, which is a continuation of U.S. Pat. App. No. 13/543,880, filed July 8, 2012, now **U.S. Pat. No. 8,958,697 B2**, which is a continuation-in-part ("CIP") of (1) U.S. Pat. App. No. 12/982,872, filed December 30, 2010, now **U.S. Pat. No. 8,238,754 B2**, and (2) U.S. Pat. App. No. 12/512,968, filed July 30, 2009, now **U.S. Pat. No. 9,337,948 B2**. The '872 application is a continuation of U.S. Pat. App. No. 10/886,514, filed July 6, 2004, now **U.S. Pat. No. 7,925,162 B2**, which claims the benefit of (1) U.S. Provisional App. No. 60/515,836, filed October 30, 2003, and (2) U.S. Provisional App. No. 60/485,072, filed July 3, 2003. The '968 application is a CIP of U.S. Pat. App. No. 11/772,187, filed June 31, 2007 (now abandoned), which is a continuation of U.S. Pat. App. No. 10/865,547, filed June 10, 2004, now **U.S. Pat. No. 7,242,868 B2**, which claims the benefit of (1) U.S. Provisional App. No. 60/477,845, filed June 10, 2003 and (2) U.S. Provisional App. No. 60/480,488, filed June 21, 2003.

*Appellant's Invention*

Appellant's invention relates to an optical local area network ("LAN") 50, shown in Figure 1, which includes network manager ("NM") 100 and

2

one or more local network clients (e.g., network client adapters ("NCAs")
104A–104C). Spec. ¶¶ 2, 24–26. Figure 1 is reproduced below with
additional annotations for illustration:



**FIG. 1**

Figure 1, as reproduced above, depicts optical local area network ("LAN")
50 including network manager ("NM") 100 and one or more local network
clients in the context of network client adapters ("NCAs") 104A–104C. NM
100 at the head end of a passive optical distribution fabric ("ODF") 102 acts
as a central transmission point and an overall controlling device for optical
LAN 50, and NCAs 104–104C use communication logic and memory to

3

respond to messages from NM 100 using a protocol (e.g., layer-1, layer-2, or
layer-3 protocol). Spec. ¶¶ 24–26.

According to Appellant's Specification, optical LAN 50 transfers data
between NM 100 and NCAs 104 in the form of "downstream frames" (from
NM 100 to NCAs 104) and "virtual upstream frames" (from NCAs 104 to
NM 100). Spec. ¶ 33. An overall structure of downstream frame 200 and
virtual upstream frame 202, is shown in Figure 2, as reproduced below:



**FIG. 2**

Figure 2, as reproduced above, depicts an overall structure of downstream
frame 200, virtual upstream frame 202, and upstream frame 224. For each

4

network period 218, NM 100 allocates each NCA 104 respective slots within
which an NCA is able to transmit data, based on total upstream bandwidth
requests communicated to NCAs 104 in downstream frame 200. Spec. ¶ 35.

*Representative Claim*

Claims 1–24 are pending. Claims 1, 23, and 24 are independent.
Claim 1 is representative of Appellant's invention as reproduced below with
bracketed letters added for clarity:

1.) A Local Area Network (LAN) client for a passive
optical LAN, the passive optical LAN disposed to having a head
end and one or more passive optical splitters for coupling the
LAN client over one or more optical fibers to the head end of the
passive optical LAN, the LAN client for a passive optical LAN
comprising of:

[A] an optical interface for converting a downstream
optical signal on a downstream optical wavelength to a
downstream electrical signal and for converting an upstream
electrical signal to an upstream optical signal and emitting the
upstream optical signal on an upstream optical wavelength;

[B] at least one network interface for receiving user data;
and

[C] a control module electrically coupled to the optical
interface and electrically coupled to the at least one network
interface and

[C1] wherein the control module processes the
downstream electrical signal having a downstream control
and downstream data information to recover an upstream
bandwidth allocation from the downstream control
information and

[C2] wherein the control module receives user data
from the at least one network interface and the control module
responsive to the upstream bandwidth allocation generates the
upstream electrical signal having upstream control and
upstream data information and

[C3] wherein at least a portion of the user data is
included in the upstream data information,

5

[D] whereby the LAN client for a passive optical LAN communicates user data upstream responsive to an upstream bandwidth allocation.

Appeal Br. 1 (Claims App.).

## REJECTIONS AND REFERENCES

(1)     Claims 1, 3–6, 11–14, 17, 18, 23, and 24 stand rejected under 35 U.S.C. § 103(a) as being obvious over the combined teachings of Husbands et al. (US 4,781,427; issued Nov. 1, 1988; "Husbands") and Yuki et al. (US 6,778,557 B1; issued Aug. 17, 2004; "Yuki"). Final Act. 11–34.

(2)     Claims 2 and 7 stand rejected under 35 U.S.C. § 103(a) as being obvious over the combined teachings of Husbands, Yuki, and Marion R. Finley, Jr. (*Optical Fibers in Local Area Networks*, 22 IEEE Comm. Mag. 22–35 (Aug. 1984) ("Finley")). Final Act. 34–36.

(3)     Claim 8 stands rejected under 35 U.S.C. § 103(a) as being obvious over the combined teachings of Husbands, Yuki, and Xu et al. (US 7,181,142 B1; issued Feb. 20, 2007; "Xu"). Final Act. 36–37.

(4)     Claim 9 stands rejected under 35 U.S.C. § 103(a) as being obvious over the combined teachings of Husbands, Yuki, and ITU-T Recommendation G.983.1 (*Broadband Optical Access Systems based on Passive Optical Networks (PON)* 1–110 (Oct. 1998) ("ITU-T")). Final Act. 37–39.

(5)     Claim 10 stands rejected under 35 U.S.C. § 103(a) as being obvious over the combined teachings of Husbands, Yuki, and Warden et al. (US 2003/0189935 A1; issued Oct. 9, 2003; "Warden"). Final Act. 39–40.

(6)     Claims 15, 16, 19, and 20 stand rejected under 35 U.S.C. § 103(a) as being obvious over the combined teachings of Husbands, Yuki,

6

Chang (US 2003/0020991 A1; published Jan. 30, 2003), and Masucci et al.
(US 6,498,667 B1; issued Dec. 24, 2002; "Masucci"). Final Act. 40–44.

(7)    Claim 21 stands rejected under 35 U.S.C. § 103(a) as being
obvious over the combined teachings of Husbands, Yuki, and Mahony et al.
(US 6,668,127 B1; issued Dec. 23, 2003; "Mahony"). Final Act. 44.

(8)    Claim 22 stands rejected under 35 U.S.C. § 103(a) as being
obvious over the combined teachings of Husbands, Yuki, Finley, and
Vujkovic-Cvijin et al. (US 2003/0039015 A1; published Feb. 27, 2003;
"Vujkovic-Cvijin"). Final Act. 44–46.


ANALYSIS

*§ 103(a) Rejection of Claims 1, 3–6, 11–14, 17, 18, 23, and 24*
*based on Husbands and Yuki*

In support of the obviousness rejection, the Examiner (1) finds the
combination of Husbands and Yuki teaches or suggests all the limitations of
Appellant's claim 1, and (2) articulates reasoning with rational underpinning
to combine Husbands and Yuki. Final Act. 12–17. In particular, the
Examiner finds Husbands teaches the claimed "Local Area Network (LAN)
client for a passive optical LAN, . . . [shown in Figures 4–5] having a head
end [24, shown in Figure 4] and one or more passive optical splitters [26, 28
shown in Figure 4] for coupling the LAN client over one or more optical
fibers to the head end of the passive optical LAN," including limitations
[A] "an optical interface" (FO XMTR and FO RCV, shown in Figure 4),
[B] "at least one network interface" (Port #1, Port #2, shown in Figure 5)
and [C] "a control module" (interface logic, shown in Figure 4) of
Appellant's claim 1 to perform part of limitations [C1], [C2], [C3], and [D]
relative to "the downstream electrical signal having downstream data

7

information" and "the upstream electrical signal having upstream control and upstream data information." Final Act. 12–13 (citing Husbands 4:3–13, 40–42, 7:7–9, 50–54, Figs. 4, 5, 8).

For example, Husbands teaches an optical local area network (LAN), shown in Figure 4, including head-end unit 24 and passive optical splitters 26, 28 arranged to communicate with a plurality of user terminal devices (LAN client) 14, via network adapter 18. Husbands' Figures 4–5 are reproduced below with additional annotations for illustration.

8



FIG. 4

FIG. 5

Husbands' Figure 4, as reproduced above, depicts a LAN client including:

[A] "an optical interface" in the form of "*FO XMTR* [and] *FO RCV*," [B] "at least one network interface" in the form of Port #1 and Port #2, shown in Figure 5, and [C] "a control module" in the form of interface logic, shown in Figure 4. Husbands 2:44, 4:3–13, 40–42, 6:18–40, 7:7–9, 26–47.

According to Husbands, the network protocol selected for use with the optical LAN is a carrier sense multiple access ("CSMA") with collision

9

detection ("CD"), also known as CSMA/CD, designed to support a large number of user devices 14.  Husbands 2:29–35.

The Examiner acknowledges Husbands does not expressly teach, but relies upon Yuki for teaching missing limitations [C1]–[C3] and [D] of Appellant's claim 1 relative (1) "to recover an upstream bandwidth allocation" when processing "the downstream electrical signal having a downstream control and downstream data information" and (2) "responsive to the upstream bandwidth allocation" when generating "the upstream electrical signal having upstream control and upstream data information" in order to support the conclusion of obviousness, i.e.,

> it would have been obvious . . . to apply the dynamic bandwidth allocation approach as taught by Yuki . . . to the system/method of Husbands . . . so that . . . the buffer memory requirements can be relaxed, and the latency time elapsed before a slave/client unit transmits a signal can be reduced, and system capacity/throughput can be increased.

Final Act. 14–17.

For example, Yuki teaches a point-to-multipoint communication system such as an optical LAN, shown in Figure 1, in which "downstream data information" and "upstream data information" are allocated with time slots (e.g., bandwidth), shown in Figure 5.  Yuki's Figure 1 is reproduced below:

10



Yuki's point-to-multipoint communication system including master unit 20 and multiple slave units 10-1 to 10-m such that transmission line 30 is allocated among slaves units 10-1 to 10-m by master unit 20, via TDM (Time Division Multiplex) and TDMA (Time Division Multiple Access) protocols. Yuki 11:51–67, 29:65–30:4, 42:46–52. However, Yuki's access protocol is not limited to TDM and TDMA, but is applicable to upstream and downstream transmission in accordance with FDM (Frequency Division Multiplex), FDMA (Frequency Division Multiple Access), CDMA (Code Division Multiple Access), and the like. Yuki 12:46–54, 29:65–30:4, 42:46–52.

Appellant does not dispute the Examiner's factual findings regarding Husbands and Yuki individually. *See* Appeal Br. 9. Instead, Appellant presents several arguments against the combination of Husbands and Yuki.

First, Appellant contends the Examiner's "combination of Husbands and Yuki is fundamentally flawed" because (1) "Husbands operates in a peer-to-peer manner that is the opposite of the master/slave operation in

Yuki"; (2) Husbands' "nodes and terminals . . . involve either . . . no processing or . . . specialized functions, none of which are control of the network in any manner"; and (3) "the operation of Yuki changes the principle of operation of Husbands" and "makes the terminals of Husbands unsuitable for their intended purpose" because Husbands has "no central controller and any terminal [that] can initiate communications" whereas "Yuki's system specifically requires a master and requires the slaves to ask for permission to transmit data." Appeal Br. 9–12.

Second, Appellant contends the Examiner's "alleged rationale to combine Yuki with Husbands is not rational" (emphasis omitted) because (1) "the system of Yuki . . . where CDMA is used does not provide a reason to use Yuki's system in the CSMA system of Husbands"; (2) "[t]he Examiner's reliance on the applicability of Yuki's system to master/slave systems is misplaced as Husbands does not have a master/slave system"; and (3) "[o]ne skilled in the art would not use Yuki's protocol that does not have collisions to modify a CSMA/CD system that inherently has collisions." *Id.* at 12–15.

Third, Appellant contends "[t]he Examiner is relying on hindsight" (emphasis omitted) because "Yuki discloses using time division multiplexing (TDM) and time division multiple access (TDMA) as part of the system" (Yuki 12:45–54) and "Yuki's access protocol may be used with other types of access control such as CDMA, FDM, and FDMA" (Yuki 29:65–30:4) but "Yuki never mentions that the system may be used with CSMA/CD," which as discussed above is the protocol used in Husbands. *Id.* at 15–16. In other words, Appellant argues (1) "Yuki never discloses that Yuki's protocol can be used in a CSMA/CD system" and, as such, Yuki's

access protocol cannot be used in Husbands' CSMA/CD system and

(2) "[t]here is no explanation how Yuki's protocol could be incorporated without modifying Husbands to be a master/slave system" and "[d]oing so would destroy the express feature of clients in Husbands to initiate communications without a central controller." Reply Br. 4–5.

Appellant's contentions are not persuasive to demonstrate reversible error. *See In re Jung*, 637 F.3d 1356, 1365 (Fed. Cir. 2011). Instead, we find the Examiner's findings are supported by a preponderance of the evidence on this record. Ans. 39–54. At the outset, we note Appellant's claim 1 broadly recites basic components of a LAN client (as described by Husbands), including "an upstream bandwidth allocation" when processing "the downstream electrical signal having a downstream control and downstream data information" and "responsive to the upstream bandwidth allocation" when generating "the upstream electrical signal having upstream control and upstream data information" which are taught or suggested by Yuki. As such, Appellant's arguments regarding (1) the alleged distinction between Husbands' peer-to-peer system (without a central controller) and Yuki's point-to-multipoint system, (2) the alleged incompatibility between Yuki's access protocol for use in TDM, TDMA, CDMA, FDM, and FDMA and Husbands' network that uses CSMA/CD are not commensurate in scope with claim 1, and thus, for that reason, do not demonstrate error in the Examiner's obviousness rejection of independent claims 1, 23, and 24. *See In re Self*, 671 F.2d 1344, 1348 (CCPA 1982) (limitations not appearing in the claims cannot be relied upon for patentability).

For example, we are unpersuaded by Appellant's argument regarding the alleged distinction between Husbands' peer-to-peer system (without a

central controller) and Yuki's point-to-multipoint system because both
Husbands and Yuki are directed to an optical local area network (LAN) (*see*
Husbands' Abstract and Yuki 1:16–23).

Likewise, we are equally unpersuaded by Appellant's argument
regarding the alleged incompatibility between Yuki's access protocol and
Husbands' access protocol because (1) both Yuki's access protocol and
Husbands' access protocol are directed to overcoming problems with
CSMA/CD and (2) Yuki's TDM (Time Division Multiplex) and TDMA
(Time Division Multiple Access) are known to be interchangeable with and
"easily adapted, for example, to FDM (Frequency Division Multiplex),
FDMA (Frequency Division Multiple Access), CDMA (Code Division
Multiple Access), and the like." Yuki 1:29–60, 2:29–34, 29:65–30:4,
42:46–52.

More importantly, we note that Appellant's arguments do not point to
any specific language within the claims to distinguish over the prior art
(Husbands and Yuki) and, as such, those arguments amount to a general
allegation that the claims define a patentable invention. Such allegations
will not be considered an argument for separate patentability. 37 C.F.R.
§ 41.37(c)(1)(iv) (2021). Instead, mere attorney arguments and conclusory
statements that are unsupported by factual evidence are entitled to little
probative value. *In re Geisler*, 116 F.3d 1465, 1470 (Fed. Cir. 1997); *see
also In re De Blauwe*, 736 F.2d 699, 705 (Fed. Cir. 1984); *Ex parte Belinne*,
No. 2009-004693, slip op. at 7–8 (BPAI Aug. 10, 2009) (informative),
*available at* https://www.uspto.gov/sites/default/files/ip/boards/bpai/
decisions/inform/fd09004693.pdf.

Although all the limitations [A]–[D] recited in Appellant's claim 1 were known as demonstrated by Husbands and Yuki, we recognize that the Examiner must still articulate "reasoning with some rational underpinning to support the legal conclusion of obviousness." *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006). However, the Examiner's reasoning need not appear in, or be suggested by, one or more of the references on which the Examiner relies upon. Instead, a reason to combine teachings from the prior art "may be found in explicit or implicit teachings within the references themselves, from the ordinary knowledge of those skilled in the art, or from the nature of the problem to be solved." *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999) (citing *In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998)). "Under the correct [obviousness] analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR Int'l Co. v. Teleflex Corp.*, 550 U.S. 398, 420 (2007).

For example, the Examiner has provided a rationale supporting motivation by a person of ordinary skill in the art to achieve the claimed subject matter, i.e., "to apply the dynamic bandwidth allocation approach as taught by Yuki . . . to the system/method of Husbands . . . so that . . . the buffer memory requirements can be relaxed, and the latency time elapsed before a slave/client unit transmits a signal can be reduced, and system capacity/throughput can be increased" is supported with sufficient rational underpinning. Final Act. 14–17; Ans. 44–45. We agree with the Examiner's findings. Appellant has not sufficiently demonstrated the Examiner's proffered reason to combine is reached in error or why a person of ordinary skill in the art *would not* have reached the conclusions reached

15

by the Examiner.  Consequently, we are not persuaded that the Examiner's proffered reason to combine these references is incorrect.

We are also unpersuaded by Appellant's argument of impermissible hindsight.  We see the hindsight question before us as asking (1) whether the Examiner's proffered combination of references is merely "the predictable use of prior art elements according to their established functions" (*KSR*, 550 U.S. at 417) and (2) whether an artisan reasonably would have combined the cited references in the manner proffered by the Examiner without having the benefit of the claim to use as a guide (i.e., impermissible hindsight).  After reviewing the teachings and suggestions of the cited references, we find the weight of the evidence shows that the proffered combination is merely a "predictable use of prior art elements according to their established functions[, i.e., substituting Yuki's access protocol with Husbands' access protocol]."  *KSR*, 550 U.S. at 415–416; *see also In re Cree, Inc.*, 818 F.3d 694, 702 n.3 (Fed. Cir. 2016) (Appellant's hindsight argument is of no moment where the Examiner provides a sufficient, non-hindsight reason to combine the references).

Lastly, we note Appellant has not demonstrated the Examiner's proffered combination of Husbands and Yuki would have been "uniquely challenging or difficult for one of ordinary skill in the art."  *See Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (citing *KSR*, 550 U.S. at 418).  "Attorney argument is no substitute for evidence."  *Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005).  Nor has Appellant provided objective evidence of secondary considerations which our reviewing court guides "operates as a

beneficial check on hindsight." *Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*, 725 F.3d 1341, 1352 (Fed. Cir. 2013).

For these reasons, we are not persuaded of Examiner error. Accordingly, we sustain the Examiner's obviousness rejection of independent claim 1 and similarly, independent claims 23 and 24, and their respective dependent claims 3–6, 11–14, 17, and 18, which are not argued separately.

With respect to dependent claim 2, 7–10, 15, 16, and 19–22, Appellant simply states that the newly cited art, including: (1) Finley, (2) Xu, (3) ITU-T, (4) Warden, (5) Chang, (6) Masucci, (7) Mahony, and (8) Vujkovic-Cvijin, does not and cannot cure the deficiencies of Husbands and Yuki. Appeal Br. 16–20. However, such a skeletal argument as offered here is not an argument in support of separate patentability pursuant to 37 C.F.R. § 41.37(c)(1)(iv) and, therefore, need not be addressed. *In re Lovin*, 652 F.3d 1349, 1356–1357 (Fed. Cir. 2011). Even if Appellant's sole argument regarding claims 2, 7–10, 15, 16, and 19–22 is an argument in support of separate patentability, we still find it unavailing because Appellant fails to dispute the Examiner's factual findings regarding these references. Ans. 55–58.

For the reasons set forth above, Appellant has not persuaded us of error in the Examiner's rejections of claims 2, 7–10, 15, 16, and 19–22. Accordingly, we also sustain the Examiner's obviousness rejections of claims 2, 7–10, 15, 16, and 19–22.

Appx0018

CONCLUSION[3]

On the record before us, Appellant does not demonstrate that the Examiner erred in rejecting: (1) claims 1, 3–6, 11–14, 17, 18, 23, and 24 as obvious over the combined teachings of Husbands and Yuki; (2) claims 2 and 7 as obvious over the combined teachings of Husbands, Yuki, and Finley; (3) claim 8 as obvious over the combined teachings of Husbands, Yuki, and Xu; (4) claim 9 as obvious over the combined teachings of Husbands, Yuki, and ITU-T; (5) claim 10 as obvious over the combined teachings of Husbands, Yuki, and Warden; (6) claims 15, 16, 19, and 20 as obvious over the combined teachings of Husbands, Yuki, Chang, and Masucci; (7) claim 21 as obvious over the combined teachings of Husbands, Yuki, and Mahony; and (8) claim 22 as obvious over the combined teachings of Husbands, Yuki, Finley, and Vujkovic-Cvijin.

---

[3] In the event of further prosecution of this application, this panel suggests the Examiner consider whether claims 1–24 should be rejected under the obviousness-type double patenting over the claims in the related issued patents, including (1) U.S. Pat. No. 10,917,176 B2, (2) U.S. Pat. No. 10,644,802 B1, (3) U.S. Pat. No. 10,892,828 B2, (4) U.S. Pat. No. 8,958,697 B2, (5) U.S. Pat. No. 8,238,754 B2, (6) U.S. Pat. No. 9,337,948 B2, (7) U.S. Pat. No. 7,925,162 B2, and (8) U.S. Pat. No. 7,242,868 B2. Claims 1–24 as pending may be significantly broader than the claims issued in those patents. If necessary, a terminal disclaimer could be and should be filed to overcome such a rejection.

## DECISION SUMMARY

In summary:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed |
|---|---|---|---|---|
| 1, 3–6, 11–14, 17, 18, 23, 24 | 103(a) | Husbands, Yuki | 1, 3–6, 11–14, 17, 18, 23, 24 | |
| 2, 7 | 103(a) | Husbands, Yuki, Finley | 2, 7 | |
| 8 | 103(a) | Husbands, Yuki, Xu | 8 | |
| 9 | 103(a) | Husbands, Yuki, ITU-T | 9 | |
| 10 | 103(a) | Husbands, Yuki, Warren | 10 | |
| 15, 16, 19, 20 | 103(a) | Husbands, Yuki, Chang, Masucci | 15, 16, 19, 20 | |
| 21 | 103(a) | Husbands, Yuki, Mahony | 21 | |
| 22 | 103(a) | Husbands, Yuki, Finley, Vujkovic-Cvijin | 22 | |
| **Overall Outcome** | | | 1–24 | |

## TIME PERIOD FOR RESPONSE

No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136. *See* 37 C.F.R. § 1.136(a)(1)(iv).

## AFFIRMED

# ABSTRACT

An optical local area network includes a passive optical distribution fabric interconnecting a plurality of nodes including a first node and a plurality of remaining nodes, a hub that includes the first node and a control module, and a client network adapter coupled to each of the remaining nodes for responding to the control module. The control module controls timing for each of the client network adapters to transmit signals over the passive optical distribution fabric and distribution of signals to each of the nodes.

What is claimed is:

1.) A Local Area Network (LAN) client for a passive optical LAN, the passive optical LAN disposed to having one or more passive optical splitters for coupling the LAN client over one or more optical fibers to the head end of the passive optical LAN, the LAN client for a passive optical LAN comprising of:

an optical interface for converting a downstream optical signal on a downstream optical wavelength to a downstream electrical signal and for converting an upstream electrical signal to an upstream optical signal and emitting the upstream optical signal on an upstream optical wavelength;

at least one network interface for receiving user data; and

a control module electrically coupled to the optical interface and electrically coupled to the at least one network interface and wherein the control module processes the downstream electrical signal having a downstream control and downstream data information to recover an upstream bandwidth allocation from the downstream control information and wherein the control module receives user data from the at least one network interface and the control module responsive to the upstream bandwidth allocation generates the upstream electrical signal having upstream control and upstream data information and wherein at least a portion of the user data is included in the upstream data information,

whereby the LAN client for a passive optical LAN communicates user data upstream responsive to an upstream bandwidth allocation.

2.) The LAN client for a passive optical LAN of claim 1, wherein the control module includes an Ethernet MAC.

3.) The LAN client for a passive optical LAN of claim 1, wherein the control module includes a passive optical LAN protocol processor.

4.) The LAN client for a passive optical LAN of claim 1, wherein the control module further adjusts timing of the generation of the upstream electrical signal responsive to receiving a response delay message.

5.) The LAN client for a passive optical LAN of claim 1, wherein the control module is configured to receive in the downstream electrical signal a network identification address assigned to the LAN client and wherein the network identification address can be used by the control module for receiving downstream data information addressed to the LAN client for a passive optical LAN.

6.) The LAN client for a passive optical LAN of claim 1, wherein the control module performs operation administration and maintenance (OAM) message processing.

7.) The LAN client for a passive optical LAN of claim 1, wherein the control module is configured to manage the transmission and reception of optical data link layer communications through the optical interface based on at least one optical data link layer address and wherein the control module includes an Ethernet Media Access Control (MAC) configured to enable Ethernet communications through the at least one network interface.

8.) The LAN client for a passive optical LAN of claim 1, wherein the LAN client adjusts the optical power level of the upstream optical signal responsive to receiving a message.

9.) The LAN client for a passive optical LAN of claim 1, wherein the LAN client receives a request for new LAN clients to identify themselves and the LAN client responds with a message including a serial number for identifying the LAN client.

10.)    The LAN client for a passive optical LAN of claim 1, wherein the downstream control information includes a consecutive sequence of bits for the LAN client to identify the beginning of a downstream frame, wherein the downstream frame includes the downstream control and data information.

11.)    The LAN client for a passive optical LAN of claim 1, wherein the upstream control information includes user data buffering status information.

12.)    The LAN client for a passive optical LAN of claim 1, wherein the control module processes the downstream electrical signal having successive downstream frames.

13.)    The LAN client for a passive optical LAN of claim 12, wherein a downstream frame includes a first number of downstream subframes having one or more downstream formats and wherein each downstream subframe includes a second number of downstream slots of time.

14.)    The LAN client for a passive optical LAN of claim 13, wherein a downstream subframe includes a downstream communication channel for communicating the upstream bandwidth allocation for provisioning upstream slots of time to the LAN client for a passive optical LAN.

15.)    The LAN client for a passive optical LAN of claim 12, wherein a downstream frame includes downstream packet data and wherein downstream packet data includes a downstream packet header and downstream packet payload and wherein the downstream packet header includes a field indicating the length of the downstream packet payload.

16.)    The LAN client for a passive optical LAN of claim 15, wherein the downstream packet payload includes at least a portion of an Ethernet frame or a Fibre Channel frame.

17.)    The LAN client for a passive optical LAN of claim 1, wherein the upstream optical signal is emitted in one or more upstream slots of time forming one or more upstream frames as governed by the upstream bandwidth allocation.

18.)    The LAN client for a passive optical LAN of claim 17, wherein upstream frames includes a first number of upstream subframes having one or more upstream formats.

19.)    The LAN client for a passive optical LAN of claim 17, wherein upstream frames includes an upstream packet header and an upstream packet payload and wherein the upstream packet header includes a field indicating an upstream packet payload length.

20.)    The LAN client for a passive optical LAN of claim 19, wherein the upstream packet payload includes at least a portion of an Ethernet frame or a Fibre Channel frame.

21.)    The LAN client for a passive optical LAN of claim 1, wherein the optical interface includes one or more optical fiber connectors selected from the group consisting essentially of:

Subscriber Connector (SC);

Lucent Connector (LC);

Fiber Channel (FC);

Straight TP (ST); and

Miniature Unit (MU).

22.)    The LAN client for a passive optical LAN of claim 1, wherein the at least one network interface is configured to communicate using a protocol from the group consisting essentially of:

IEEE 10Mbit Ethernet;

IEEE 100Mbit Ethernet;

IEEE 1000Mbit Ethernet;

Fibre Channel;

IEEE 802.11;

IEEE 802.16; and

Digital Subscriber Line (DSL)

23.)    A Local Area Network (LAN) client for a passive optical LAN, the passive optical LAN disposed to having one or more passive optical splitters for coupling the LAN client over one or more optical fibers to the head end of the passive optical LAN, the LAN client for a passive optical LAN comprising of:

an optical interface for converting a downstream optical signal on a downstream optical wavelength to a downstream electrical signal and for converting an upstream electrical signal to an upstream optical signal and emitting the upstream optical signal on an upstream optical wavelength;

at least one network interface for receiving user data; and

a control module electrically coupled to the optical interface and electrically coupled to the at least one network interface and wherein the control module processes the downstream electrical signal having a downstream control and downstream data information to recover an upstream bandwidth allocation from the downstream control information wherein the upstream bandwidth allocation includes a start and end time slot number or a start time and length of time and wherein the control module receives user data from the at least one network interface and the control module responsive to the upstream bandwidth allocation generates the upstream electrical signal having upstream control and upstream data information and wherein at least a portion of the user data is included in the upstream data information,

whereby the LAN client for a passive optical LAN communicates user data upstream responsive to an upstream bandwidth allocation.

24.) A Local Area Network (LAN) client for a passive optical LAN, the passive optical LAN disposed to having one or more passive optical splitters for coupling the LAN client over one or more optical fibers to the head end of the passive optical LAN, the LAN client for a passive optical LAN comprising of:

an optical interface for converting a downstream optical signal on a downstream optical wavelength to a downstream electrical signal and for converting an upstream electrical signal to an upstream optical signal and emitting the upstream optical signal on an upstream optical wavelength;

at least one network interface for receiving user data; and

a control module electrically coupled to the optical interface and electrically coupled to the at least one network interface and wherein the control module processes the downstream electrical signal having a downstream control and downstream data information to recover an upstream bandwidth allocation from the downstream control information wherein the upstream bandwidth allocation includes a start and end time slot number or a start time and length of time and wherein the control module receives user data from the at least one network interface and the control module responsive to the

upstream bandwidth allocation generates the upstream electrical signal having upstream control and upstream data information and wherein at least a portion of the user data is included in the upstream data information,

whereby the LAN client for a passive optical LAN ends the optical upstream signal emissions responsive to the end time slot number or the end of the length of time and whereby the LAN client for a passive optical LAN communicates user data upstream responsive to an upstream bandwidth allocation.



50
100
Network Manager
106
NM-CLM
112
NM Engine
114
TX Framer
RX Framer
115
108
NM Optical nterface
109
110
ODF Interface
116
Optical Splitter
117A
ODF Port
117B
ODF Port
117C
ODF Port
102
ODF
105A
105B
105C
104A
Network Client Adapter
120
NC-CLM
124
ODF Port
122
NC Optical Interface
131
De-Framer
Framer
130
128
NC Engine
126
Adaptation Unit
132
Egress
Ingress
133
134
136
Network Interface
104B
Network Client Adapter
104C
Network Client Adapter

FIG. 1



200
Downstream
202
Upstream
Virtual
Frame
224
Upstream
Network Period
218
Network Period
Header
n
Payload n
Header
n+1
204
Payload n+1
206
208
DS Sync
210
Station
Management
212
# of NCs
214
# of NCs
216
US Slot Allocation
Slot 0
Slot 1
Slot 2
Slot 3
Slot 4
Slot 5
Slot 6
Slot 7
Slot 8
Slot 9
Slot 10
Slot 11
Slot 12
Slot 13
Slot 14
Slot 15
Slot 16
226
NC-A
Header
n
228
NC-A
Payload
n
NC-B
Header
n
NC-B
Payload
n
Un-
assigned
Slots
NC-C
Header
n
NC-C
Payload
n
Unassigned
Slots
NC-B
Header
n
NC-B
Payload
n
Preamble
230
Delimiter
232
Station
Management
234
220
US Slot Allocation n
NC-ID
Start
End
NC 104A
0
5
NC 104B
6
10
NC 104C
13
16
222
US Slot Allocation n+1
NC-ID
Start
End
NC 104B
5
16

FIG. 2



Network Period
200
Downstream
Header n
Payload n
Header n+1
Payload n+1
204
300
206
Adaptation Data Unit (ADU)
226
228
224
Upstream
NC-A Header n
NC-A Payload n
NC-B Header n
NC-B Payload n
Un-assigned Slots
NC-C Header n
NC-C Payload n
Unassigned Slots
NC-B Header n
NC-B Payload n

FIG. 3A

Network Period
200
Downstream
Header n
Payload n
Header n+1
Payload n+1
204
206
302
304
Downstream & Upstream Payload Format
Sub-Frame Header #1
Sub-Frame Payload #1
Sub-Frame Header #2
Sub-Frame Payload #2
Sub-Frame Header #N
Sub-Frame Payload #N
PLI
CRC
Type
CRC
PDU #1
CRC (opt)
318
308
310
312
314
316
226
228
224
Upstream
NC-A Header n
NC-A Payload n
NC-B Header n
NC-B Payload n
Un-assigned Slots
NC-C Header n
NC-C Payload n
Unassigned Slots
NC-B Header n
NC-B Payload n

FIG. 3B



**Network Client (NCA)**

NCA is powered ON. 410

412 NCA Synchronizes to Downstream Frame

414 NCA Interprets Downstream message waiting for initial transmit power setting and request for serial number

416 NCA Transmits Serial ID Number

418 NCA waits for message to adjusts transmit power level and sets power accordingly

420 NCA waits for message to perform Response Delay process after which NCA aligns transmission to Network Period

422 NCA's Normal Operation
Transmits network data in the upstream and Receives network data in the downstream

Downstream

Upstream

**Network Manager (NM)**

NM is powered ON. 400

402 NM activates Clients by sending messages requesting new NCAs to identify themselves (report NCA serial number) and setting initial power level to transmit.

404 NM is aware of new Client and request new Client to adjust transmit power level by sending message

406 NM initiates Response Delay process by sending message

419 NM performs Response Delay process with NCA

408 NM's Normal Operation
Transmits network data in the downstream and Receives network data in the upstream

FIG. 4

Appx0045

**Determining Response Delay**



500 — ( NM starts process with a Client )

502 — NM assigns no NCA slots generating a silence period

504 — NM sends Response Delay message to specific NCA

506 — NCA receives Response Delay message and transmits response message

508 — NM receives NCA response message and calculates Network Period parameters

510 — NM transmits Network Period parameters to NCA

512 — NCA aligns transmission to Network Period

**FIG. 5**



**FIG. 6A**

Appx0047



**FIG. 6B**

Appx0048



FIG. 6C

Appx0049



FIG. 7A

Appx0050



**FIG. 7B**

Appx0051



**FIG. 7C**

Appx0052



FIG. 7D

Appx0053



FIG. 8

Appx0054



808
Conventional Switch
802
NC-OM
120
NC-CLM
126
Adaptation Unit
132
Egress
Ingress
133
124
ODF Port
105
122
NC Optical Interface
131
De-Framer
Framer
130
128
NC Engine
134
136
900
L2 Switch
(with MACs)
PHY Port
902
LAN/SAN Ports
(Wireline & Wireless)

FIG. 9A

910
NC Switch (Switch-less & MAC-less)
912
Network Client Adapter (NCA)
120
NC-CLM
126
Adaptation Unit
124
ODF Port
105
122
NC Optical Interface
131
De-Framer
Framer
130
128
NC Engine
134
136
PHY Port
902
LAN/SAN Ports
(Wireline & Wireless)

FIG. 9B

# COMMUNICATION SYSTEM AND METHOD FOR AN OPTICAL LOCAL AREA NETWORK

## CROSS-REFERENCE TO RELATED APPLICATIONS

[0001] This application is filed under 37 C.F.R. §1.53(b) as a continuation claiming the benefit under 35 U.S.C. §120 of the pending patent application Ser. No. 16/866,479, "Communication System and Method for an Optical Local Area Network", which was filed by the same inventors on May 4, 2020, claiming the benefit under 35 U.S.C. §120 of the pending patent application Ser. No. 16/734,270, "Communication System and Method for an Optical Local Area Network", which was filed by the same inventors on January 3, 2020, claiming the benefit under 35 U.S.C. §120 of the pending patent application Ser. No. 14/588,899, "System and Method for Optical Layer Management in Optical Modules and Remote Control of Optical Modules", which was filed by the same inventors on January 2, 2015, claiming the benefit under 35 U.S.C. §120 of the pending patent application Ser. No. 13/543,880, "System and Method for Optical Layer Management in Optical Modules and Remote Control of Optical Modules", which was filed by the same inventors on July 08, 2012, claiming the benefit under 35 U.S.C. §120 of the pending Patent application No. 12/ 982,872, "System and Method for Pluggable Optical Modules for Passive Optical Networks", which was filed by the same inventors on Dec. 30, 2010, claiming the benefit under 35 U.S.C. §120 of U.S. Patent No. 7,925,162 filed on July 6, 2004 claiming the benefit under 35 U.S.C. 119(e) of U.S. Provisional Application No. 60/485,072 filed July 03, 2003, now expired, and U.S. Provisional Application No. 60/515,836 filed Oct. 30, 2003, now expired; and claiming the benefit under 35 U.S.C. §120 of the pending Patent application No. 12/512,968, "System and Method For Performing High Speed Communications Over Fiber Optical Networks", which was filed by the same inventors on filed July 30, 2009 claiming the benefit under 35 U.S.C. §120 of U.S. Patent Application Ser. No. 11/772,187, which was filed by the same inventors on June 30, 2007, now abandoned, claiming the benefit under 35 U.S.C. §120 of commonly-assigned U.S. Patent Application Ser. No. 10/865,547 filed by the same inventors on June 10, 2004, now U.S. Pat. No. 7,242,868, which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Application No. 60/477,845 filed June 10, 2003, now expired, and U.S. Provisional Application No. 60/480,488 filed June 21, 2003, now expired, and entirely incorporated herein by reference.

## FIELD OF THE INVENTION

[0002] The present invention relates to optical fiber networks.

## BACKGROUND OF THE INVENTION

[0003] A local-area network (LAN) is a computer network that spans a relatively small area or domain. Most LANs are confined to a single building or group of buildings. However, one LAN can be connected to other LANs over any distance often spanning an area greater than either LAN via telephone lines, coaxial cable, optical fiber, free-space optics and radio waves. A system of LANs can be connected in this way via other networks that are commonly referred to as wide-area networks (WANs).

## SUMMARY OF THE INVENTION

[0004] In general, in one aspect, the invention includes a method for broadcasting data including receiving an incoming optical signal at a first port of a plurality of ports; converting the received incoming optical signal to an electrical signal; processing the electrical signal; converting the processed electrical signal to a broadcast optical signal; and coupling the broadcast optical signal to each of the plurality of ports.

[0005] Aspects of the invention may include one or more of the following features. Processing the electrical signal includes coupling the electrical signal to a device that processes the electrical signal according to an OSI layer-2 protocol. Processing the electrical signal includes coupling the electrical signal to a device that processes the electrical signal according to an OSI layer-3 protocol. The method further includes converting an electrical client signal to the incoming optical signal. The method further includes adapting the electrical client signal from a signal conforming to an OSI layer-2 protocol. The OSI layer-2 protocol includes a media access control protocol. The media access control protocol is Ethernet or Fibre Channel. The method further includes transmitting the incoming optical signal from a network client adapter to one of the plurality of ports over an optical distribution fabric. The method further includes transmitting the broadcast optical signal from one of the plurality of ports over an optical distribution fabric; and receiving the broadcast optical signal at network client adapters in a plurality of clients. The method further includes converting the received broadcast optical signal to a second electrical signal in at least one of the clients. The method further includes selecting a frame within the second electrical signal associated with the network client adapter and adapting data in the selected frame for transmission over a network interface.

[0006] In general, in another aspect, the invention includes an apparatus including a plurality of ports; a passive optical coupler coupled to each of the plurality of ports; an optical-electrical converter in optical communication with the passive optical coupler; and a control module in electrical communication with the optical-electrical converter for scheduling slots for incoming and outgoing signals over the plurality of ports.

[0007] Aspects of the invention may include one or more of the following features. The control module is operable to schedule a slot for receiving a signal over one of the plurality of ports and to schedule a slot for broadcasting a signal over each of the plurality of ports. The apparatus

includes only a single optical-electrical converter in optical communication with the passive optical coupler. The control module is coupled to a device that is operable to process an electrical signal provided by the optical-electrical converter according to an OSI layer-2 protocol. The control module is coupled to a device that is operable to process an electrical signal provided by the optical-electrical converter according to an OSI layer-3 protocol.

[0008] In general, in another aspect, the invention includes an optical local area network including a plurality of optical waveguides; a network manager that includes an optical-electrical converter in optical communication with the plurality of optical waveguides; and a control module in electrical communication with the optical-electrical converter for scheduling slots for incoming and outgoing signals transmitted over the plurality of optical waveguides; and a plurality of network client adapters coupled to the plurality of optical waveguides, each network client adapter including an optical-electrical converter for processing transmitted and received optical signals at a client.

[0009] Aspects of the invention may include one or more of the following features. The optical local area network further includes a passive optical coupler coupled to each of the plurality of optical waveguides. The network manager further includes a passive optical coupler coupled to each of the plurality of optical waveguides. The control module is operable to schedule a slot for receiving a signal over one of the plurality of optical waveguides and to schedule a slot for broadcasting a signal over each of the plurality of optical waveguides. The control module is operable to dynamically schedule a slot for receiving a signal over one of the plurality of optical waveguides in response to a message from one of the network client adapters. The control module is operable to determine a response delay between the optical-electrical converter and one of the network client adapters. The control module is coupled to a device that is operable to process an electrical signal provided by the optical-electrical converter according to an OSI layer-2 protocol. The control module is coupled to a device that is operable to process an electrical signal provided by the optical-electrical converter according to an OSI layer-3 protocol. Each of the network client adapters is operable to convert an electrical client signal to an optical signal for transmission over one of the optical waveguides. Each of the network client adapters is operable to adapt the client signal from a signal conforming to an OSI layer-2 protocol. The OSI layer-2 protocol includes a media access control protocol. The media access control protocol used by a network client adapter is Ethernet or Fibre Channel. Each of the network client adapters is operable to convert a received optical signal to an electrical signal. Each network client adapter is operable to select a frame within the electrical signal associated with the network client adapter. The optical local area network further includes a client that includes a network interface card, the network interface card including one of the network client adapters. The client is selected from the group consisting of a workstation, a personal computer, a disk storage array, a server, a switch, and a router.

[0010] In general, in another aspect, the invention includes an optical local area network including a passive optical distribution fabric interconnecting a plurality of nodes including a

first node and a plurality of remaining nodes; a hub that includes the first node and a control module; and a client network adapter coupled to each of the remaining nodes for responding to the control module; wherein the control module controls timing for each of the client network adapters to transmit signals over the passive optical distribution fabric and distribution of signals to each of the nodes.

[0011] Aspects of the invention may include one or more of the following features. The control module is operable to schedule a slot for receiving a signal from one of the remaining nodes and to schedule a slot for broadcasting a signal to each of the remaining nodes. The control module is operable to dynamically schedule a slot for receiving a signal from one of the remaining nodes in response to a message from one of the network client adapters. The control module is operable to determine a response delay between the hub and one of the network client adapters. The control module is coupled to a device that is operable to process signals according to an OSI layer-2 protocol. The control module is coupled to a device that is operable to process signals according to an OSI layer-3 protocol. Each of the network client adapters is operable to convert an electrical signal to an optical signal for transmission over the passive optical transmission fabric. Each of the network client adapters is operable to adapt a signal conforming to an OSI layer-2 protocol. The OSI layer-2 protocol includes a media access control protocol. The media access control protocol used by a network client adapter is Ethernet or Fibre Channel. Each of the network client adapters is operable to convert a received optical signal to an electrical signal. Each network client adapter is operable to select a frame within the electrical signal associated with the network client adapter. The optical local area network further includes a client that includes a network interface card, the network interface card including one of the network client adapters. The client is selected from the group consisting of a workstation, a personal computer, a disk storage array, a server, a switch, and a router.

[0012] In general, in another aspect, the invention includes an optical local area network including a hub; a plurality of external nodes interconnected by a passive optical distribution fabric, wherein the external nodes are located external to the hub, and the hub is operable to control traffic across all nodes; adaptors at each external node responsive to hub instruction; and an interface coupled to the hub coupling signals received from any individual external node for distribution to all external nodes.

[0013] Aspects of the invention may include one or more of the following features. The hub includes an internal node coupled to the passive optical distribution fabric. The hub is operable to measure response delay between the hub and external nodes. The hub is operable to allocate slots for external nodes dynamically. Slot allocations are made to guarantee external nodes have a minimum bandwidth. The optical local area network further includes splitters coupled between the hub and external nodes. Traffic arriving at one or more external nodes includes Ethernet traffic. Traffic arriving at one or more external nodes includes Fibre channel traffic. The hub includes an optical module. At least one of the external nodes is located within an optical module external to the hub.

[0014] Implementations of the invention may include one or more of the following advantages. A network manager in an optical local area network can provide switching functions of a hub, a switch or a router. A switch configuration in which network managers are aggregated enables a high performance network in a compact apparatus. Connectivity of network managers and network client adapters to existing conventional routers and switches using industry standard form factor optical modules enables a high performance network upgrade with minimal new equipment. A network client switch can support multiple physical layer ports without necessarily requiring a Layer-2 MAC or switching elements and the associated routing tables and packet memory. The number of optical transceivers and switching elements used to sustain the same number of computing nodes in a LAN via a point-to-multipoint optically coupled network configuration is reduced, thus saving the majority of expense described above.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0015] FIG. 1 is a block diagram of an optical local area network.

[0016] FIGS. 2, 3A and 3B are schematic diagrams showing frame structures.

[0017] FIG. 4 is a flowchart for a network operating process.

[0018] FIG. 5 is a flowchart for a response delay process.

[0019] FIGS. 6A - 6C are diagrams of optical local area networks utilizing a hub configuration

[0020] FIGS. 7A-7D are diagrams of optical local area networks utilizing a switch configuration.

[0021] FIG. 8 is a diagram of an optical local area network.

[0022] FIGS. 9A and 9B are block diagrams of switches.

## DETAILED DESCRIPTION

[0023] Referring to _FIG. 1, a high-level schematic of an optical local area network **50** includes a network manager (NM) **100** at the head end of a passive optical distribution fabric (ODF) **102**. The NM **100** acts as a central transmission point and an overall controlling device for the optical local area network **50**. On another end, the ODF **102** is terminated by a plurality of (in one implementation, generally similar) network client adapters (NCAs) **104A**, **104B**, **104C**. Herein the NCA **104A**, NCA **104B**, NCA **104C**, are also referred to collectively as NCAs **104**. Though three NCAs **104** are shown more or fewer NCAs may be included in the optical local area network **50**.

[0024] The NM **100** transmits/receives data to/from the NCAs **104** in the form of modulated optical light signals of known wavelength through the ODF **102**. The transmission mode of the

data sent over the ODF **102** may be continuous, burst or both burst and continuous modes. Both NM **100** and NCAs **104** may transmit light signals having a same wavelength. In one implementation, the light signals are polarized and the polarization of light transmitted by the NM **100** is perpendicular to the polarization of the light transmitted by the NCAs **104**. Alternatively, the transmissions can be-made in accordance with a time-division multiplexing scheme or similar protocol.

[0025] In another implementation, bi-directional wavelength-division multiplexing (WDM) may be used. Bi-directional WDM is herein defined as any technique by which two optical signals having different wavelengths may be simultaneously transmitted bi-directionally with one wavelength used in each direction over a single fiber. In yet another implementation, bi-directional dense wavelength- division multiplexing (DWDM) may be used. Bi-directional DWDM is herein defined as any technique by which more than two optical signals having different wavelengths may be simultaneously transmitted bi-directionally with more than one wavelength used in each direction over a single fiber with each wavelength unique to a direction. For example, if bi-directional WDM is used, the NM **100** may transmit data to an NCA **104A**, **104B**, **104C** utilizing a first wavelength of modulated light conveyed via a fiber **105A**, **105B**, **105C**, respectively, in the ODF **102** and, similarly, the NCAs **104A**, **104B**, **104C** may transmit data via the same fiber **105A**, **105B**, **105C**, respectively, in the ODF **102** to the NM **100** utilizing a second wavelength of modulated light. Because only a single fiber is used (e.g., between the NM **100** and each respective NCA **104**), this type of transmission system is commonly referred to as a bi-directional transmission system. Although the optical local area network **50** illustrated in FIG. 1 includes an NM **100** in communication with a plurality of NCAs **104** using a plurality of fibers, other implementations of optical local area networks **50** may be used. In some implementations, the NCAs **104** are generally similar. In other implementations, the NCAs **104** may differ in one or more aspects.

[0026] The NM **100** includes network management communication logic and memory (NM-CLM) **106** block, a network management optical interface (NM Optical Interface) **108** block and an optical distribution fabric interface (ODF Interface) **110** block. The NM-CLM **106** includes a network manager engine (NM Engine) **112** block, a transmit framer (Tx Framer) **114** block and a receive framer (Rx Framer) **115** block.

[0027] The NM Engine **112** is a control module that performs various processing and scheduling functions of an NM **100**. The Tx Framer **114** frames outgoing data from the NM Engine **112** in accordance with a framing protocol that is in-use. The Rx Framer **115** receives incoming frames and recovers appropriate data and messages to pass on to the NM Engine **112**. The NM Optical Interface **108** is controlled by the NM-CLM 106 using, for example, bus **109**. The NM Optical Interface **108** converts electrical signals carrying data from the Tx Framer **114** to optical signals, for example, by modulating a laser (not shown) included in the NM Optical Interface **108** and transmitting the laser output to the ODF interface **110**. The NM Optical Interface **108** also receives optical signals from the ODF interface **110** and converts the optical signals to electrical

signals carrying data that is then transferred to the Rx Framer **115**. Thus, the NM Optical Interface **108** functions as an "optical-electrical converter" that can convert a signal from an optical signal to electrical signal or from an electrical signal to an optical signal.

[0028] The ODF Interface **110** includes an optical splitter **116** and a plurality of ODF Ports **117A**, **117B**, **117C**, etc. For example, the optical splitter **116** can be a 1:n splitter (where n is at least 2) that splits light coming from the NM Optical Interface **108** into n portions of light coupled into n optical ports, respectively. The optical ports (e.g., ODF Ports **117**) can be coupled to one or more optical waveguides. In one implementation, each ODF Port **117** is coupled to an optical waveguide. The optical waveguides can be, for example, single mode or multimode fibers that guide received/transmitted light to/from respective ODF Ports **117A**, **117B**, **117C**, etc. The 1:n splitter (or equivalently, n:1 combiner) also directs light from any of the ODF Ports **117A**, **117B**, **117C**, etc. received over one of the optical waveguides to the NM Optical Interface **108**. ODF Ports **117A**, **117B**, **117C**, etc. include optical fiber connector sockets (e.g., SC, LC, FC, ST, or MU connector sockets) for coupling to the optical waveguides.

[0029] The ODF **102** can include any of a variety of passive optical components including optical fibers (e.g., single mode fibers, multimode fibers), optical connectors, fiber splices, passive branching components (e.g., passive splitters) and passive optical attenuators.

[0030] In this implementation, the NCAs **104** each include a network client communication logic and memory (NC-CLM) **120** block, a network client optical interface (NC Optical Interface) **122** block and an ODF port **124**. The NC-CLM **120** block includes an Adaptation Unit **126** block, a network client engine (NC Engine) **128** block, a transmit framer (Framer) **130** block and a receiver framer (Deframer) **131** block. The NC Engine **128** is a control module that performs various functions associated with an NCA **104**, such as responding to messages from the NM **100**. The Framer **130** frames outgoing data from the NC Engine **128** in accordance with a framing protocol that is in-use. The Deframer **131** receives incoming frames and recovers appropriate data and messages to pass on to the NC Engine **128**. The adaptation unit **126** receives and transmits data and messages in the form of frames, packets or cells according to one or more external protocol(s). External controls, data and messages can be received using the network interface **136**. The responsibilities of the adaptation unit **126** may include providing buffering, data and/or message filtering and translation between the external protocol(s) and the protocol of the optical local area network **50**. The adaptation Unit **126** includes egress queue **132** block and ingress queue **133** block. Egress and ingress queues **132**, **133** can be of the form of memory and are used for buffering receive and transmit data and messages, respectively. The adaptation unit **126** can filter out or drop data and/or messages that are not intended to egress through its network interface **136**. Filtering can be based on the destination address of the data and/or messages according to the external protocol in-use. Additionally, the adaptation unit **126** can filter out or drop data and/or messages that are not intended to ingress through its network interface **136**. Filtering can be based on equal values for the source and destination addresses of

the data and/or messages according to the external protocol in-use. The NC Optical Interface **122** is controlled by the NC-CLM **128** using bus **134**. The NC Optical Interface **122** converts

electrical signals carrying data from the Framer **130** block to optical signals, for example, by modulating a laser (not shown) included in the NC Optical Interface **122** and transmitting the laser output to the ODF port **124**. The NC Optical Interface **122** also receives optical signals from the ODF port **124** and converts the optical signals to electrical signals carrying data that is then transferred to the Deframer **131** block. The ODF port **124** includes an optical fiber connector socket (e.g., an SC, LC, FC ST, or MU connector socket).

[0031] The. NCAs **104** can be coupled to data link layer devices (not shown) or physical layer devices (not shown) using network interface **136**. The data link layer devices and physical layer devices are network devices that operate at a Layer-2 or Layer-I respectively, according to the Open Systems Interconnect (OSI) 7-layer reference model. Furthermore, these network devices may comply with industry standard specifications such as IEEE 802.3 and Fibre Channel (incorporated herein by reference). Consequently, the network interface **136** may be an MII, GMII, XGMII, XAUI or SPI type interface. Other Layer-2 and Layer-I type interface specifications may also be used.

[0032] The optical local area network **50** transfers data between an NM **100** and the NCAs **104** in the form of downstream frames (NM **100** to NCAs **104**) and upstream "virtual frames" (NCAs **100** to NM **104**). Downstream frames from the NM **100** are transmitted into the ODF **102** in an essentially continuous sequence of constant period frames. In one implementation, downstream frames have a period of 125 μs, and transfer data downstream at a rate of approximately 10 Gb/s, although other periods and rates may be used. The ODF Interface **110** and potentially the ODF **102** split the downstream transmissions passively so that all NCAs **104** receive the frames in a generally broadcast manner. In the upstream direction, separate transmissions from the plurality of NCAs **104** are transmitted as burst transmissions or in slots which are combined in a virtual frame so that the separate burst transmissions do not collide when they arrive at the NM **100**. In one implementation, the virtual upstream frames have essentially the same period as the downstream frames, and upstream data transmissions are transmitted at a rate approximately equal to the downstream rate. Alternatively, different upstream and downstream rates may be used.

[0033] FIG. 2 is a schematic timing and framing diagram, showing overall structure of a downstream frame **200**, and a virtual upstream frame **202** in an implementation of a framing protocol. Referring now to FIG.s 1 and 2, each downstream frame **200** includes a header **204** and a payload section **206**. The downstream header **204** includes a downstream synchronization (DS Sync) **208** section, a station management **210** section, two sections containing the number of NCAs **104** in communication with the NM **100** (# of NCAs) **212**, **214** and an upstream slot allocation (US slot allocation) **216** section. The DS Sync **208** section includes a consecutive sequence of bits that enables receiving NCAs **104** to identify a beginning of the downstream

frame **200** and thus acts as starting marker for frame timing throughout the optical local area network **50**. The number of NCAs **104** in communication with the NM is sent twice **212,214** to ensure correct interpretation of the US slot allocation section **216**. The order of downstream header sections **210,212,214,216** after a DS Sync **208** may differ in other implementations.

[0034] During each network period **218** defined by respective adjacent downstream headers, each NCA **104** is able to send upstream data. The virtual upstream frame **202** is partitioned into slots, where a "slot" corresponds to a fixed number of bits or a fixed length of time within a virtual frame. For each network period **218**, the NM **100** allocates each NCA **104** respective slots within which an NCA is able to transmit data upstream. Each slot allocation includes a start slot number and end slot number (also referred to as start time and end time), relative to the starting marker defined by a DS Sync **208** from the next network period after an NCA **104** receives a slot allocation. In alternative implementations, a start slot number and a length of time during which a specific NCA **104** is permitted to transmit may be sent instead of a start slot number and an end slot number. Slot allocation start and end numbers are allocated within the virtual upstream frame so that slot allocations do not overlap, ensuring that there are no collisions of data from different NCAs **104** at the NM **100**. The allocations can be determined by the NM Engine **112** based on total upstream bandwidth requests and can be communicated to NCAs **104** in the downstream frame US slot allocation **216** section. The US slot allocation **216** section includes start and end slot numbers pertaining to and identified to specific NCAs **104** (as shown in **220** and **222**). Slot allocations assigned to NCAs **104** can be dynamic and may be changed from network period to network period.

[0035] The upstream frame **224** includes header **226** and payload **228** sections. The header **226** includes a preamble **230** section, a frame delimiter (Delimiter) **232** section and a station management **234** section. The preamble **230** section includes a consecutive sequence of bits designed to aid an NM **100** in synchronizing to the bit clock of a respective transmitting NCA **104**. The Delimiter **232** includes a consecutive sequence of bits designed to aid an NM **100** in synchronizing to and recognizing the beginning of an upstream frame **224**.

[0036] Each downstream frame **200** and upstream frame **224** includes a payload section **206**, **228** respectively, in which data to and from NCAs **104** (from the network interface **136**) are transferred. FIG. 3A is a schematic showing the payload in downstream and upstream framing, showing that the payload of both upstream and downstream may contain a single adaptation data unit (ADU) **300**. ADUs **300** are output units of data from an adaptation unit **126**, where the adaptation unit **126** has processed data received from the network interface **136** for transfer across the optical local network **50**. For example, in one implementation the adaptation unit **126** receives Ethernet media access control frames (MAC frames) via a GMII interface (as an implementation for the network interface **136**) and removes the MAC frame's preamble and start of frame delimiter (SFD) fields with the remaining fields of the MAC frame encapsulated in an ADU **300**. Additionally, in one implementation the adaptation unit **126** receives Fibre Channel (FC) FC-2 frames through a serial interface (as an implementation of the network interface **136**)

and removes the FC-2 frame's start of frame and end of frame fields with the remaining fields of the FC-2 frame encapsulated in an ADU **300**.

[0037] In another example, the adaptation unit **126** can receive IEEE 802.3 MAC frames via a GMII interface and form an ADU **300** with the entire MAC frame included (i.e., encapsulate the entire MAC frame). In yet another example, the adaptation unit **126** can receive FC-2 frames through a serial interface (as an implementation for the network interface **136**) and form an ADU **300** with the entire FC-2 frame included (i.e., encapsulate the entire FC-2 frame).

[0038] In one implementation, the payload **204**, **232** of downstream frames **200** and upstream frames **224** may include multiple consecutive sub-frames. Referring to FIG.s 1 and 3B, a sub-frame includes a sub-frame header **302** section and a sub-frame payload **304** section. A sub-frame header **302** section includes a payload length indicator (PLI) **308** and cyclic redundancy check (CRC) **310** section that covers the PLI **308**. CRC sections, although not shown, may be used in the downstream **200** and upstream **224** frames as well. The sub-frame payload **304** section includes a type **312** section, a CRC **314** that relates to the type **312** section, a payload data unit (PDU) **316** and optionally a CRC **318** that relates to the PDU **316**. The PLI **308** gives an indication of the length, e.g., in bits, of the sub-frame payload **304** section immediately following the sub-frame header **302**. The type **312** section gives an indication of the type of data in the PDU **316**. An adaptation unit **126** may receive data from a mixture of protocols essentially simultaneously (as described below) and the use of sub-frames allows the data to be transferred across the network ensuring quality of service or class of service. An adaptation unit **126** uses sub-frames by placing received data in the PDU **316**, indicating the type of data received in the type **312** section and entering the length of the sub-frame payload **304** in the PLI **308** section.

[0039] The optical local area network **50** operates according to an exemplary process illustrated in FIG. 4. Referring now to FIG.s 1 and 4, after an NM **100** is powered on **400**, the NM **100** sends out **402** one or more message(s) requesting new NCAs 104 (NCAs **104** that the NM **100** is unaware of) to identity themselves by reporting to the NM 100 with their respective serial number. The NM **100** also sends out **402** network parameters including initial NCA transmit power levels using, for example, a station management message(s). The NCAs **104** respond using slot allocation(s) given by the NM **100** for new NCAs **104** to respond. After successfully receiving new NCA serial numbers, the NM **100** assigns each new NCA **104** a network identification number (NC-ID) and requests **404** the new NCA **104** to adjust its transmitting power level. In one implementation, the NM **100** sends these requests in a station management message. The respective new NCAs **104** use the assigned NC-ID to interpret specific messages of concern (i.e., addressed) to a given NCA **104**. The NM **100** initiates **406** a response delay process to determine the delay in responses between the new NCA and the NM **100**. After performing **419** the response delay process, the NM **100** enters normal operation in which network data is transmitted and received **408** across the optical local area network **50**.

[0040] When an NCA **104** is powered on **410**, the NCA **104** attempts to synchronize **412** to downstream frames by searching for the DS Sync **208**. After successful downstream synchronization, the NCA **104** interprets **414** network parameters received via downstream station management messages **404**, adjusts its initial transmit power level and awaits instructions (e.g., a message) for new NCAs **104**. The instructions include a slot allocation for new NCAs **104** to respond **416** to the NM **100** with the NCA's **104** serial number. Once the NCA **104** has sent its serial number the NCA **104** is then assigned an NC-ID by the NM **100**. The NCA **104** then enters a waiting loop (e.g., for a station management message from the NM **100** to adjust its transmit power level). In response to a request to set transmit power level, the NCA **104** adjusts the transmit power level **418**. The NCA **104** then enters a waiting loop again (e.g., until receipt of a message from the NM **100** to initiate a response delay process). Upon receipt of an instruction to begin a response delay process, the NCA **104** can, in cooperation with the NM **100**, determine the delay between the respective network elements (not shown as part of the process flow). The details of the response delay process are described in greater detail below. After the NCA **104** and NM **100** complete the response delay process, the NCA **104** may adjust **420** its alignment with the network period to account for downstream and upstream transmission delay. The NCA **104** then enters its normal operation state in which network data is received and transmitted **422**.

[0041] FIG. 5 shows one implementation for executing a response delay process **500**. The response delay process **500**, is a process to determine the delay in NM downstream transmission to NM upstream reception of a message or network data transmission. Referring now to FIG.s 1, 2 and 5, the NM **100** starts **501** the delay process with a new NCA **104** or with an NCA **104** that may cause upstream transmission collisions. The NM **100** assigns one or more slot(s) to the target NCA **104** (i.e., the new NCA or one NCA that may cause a collision in upstream communication) to respond with a response delay message. The NM **100** generates **502** a silence period in the upstream virtual frame **202** (e.g., by not assigning or granting any slots for that period) around the slot(s) assigned to the target NCA **104**. The silence period ensures no upstream collisions will occur. The NM **100** sends **504** a message to the NCA **104** to respond with a response delay message and informs the NCA **104** of its slot(s) assignment to respond. Thereafter, the NCA **104** responds **506** to the NM **100** at the appropriate slot time. The NM **100** receives the NCA **104** response delay message and calculates **508** the transmission delay. In one implementation, the NM **100** transmits **510** the result of the response delay calculation to the NCA **104** and the NCA **104** aligns **512** itself to the proper network period.

[0042] The NM **100** may assign, schedule or grant slot allocations in a number of ways (e.g. according to fixed time-division multiplex or statistical time-division multiplex schemes). In one implementation the slot allocations are scheduled to give the NCs **104** a guaranteed minimum upstream transfer rate. The rate may be determined by dividing the maximum upstream data rate by the number of NCAs **104**. In another implementation, the NM **100** receives status information about the NCAs **104** egress **132** and ingress **133** queue status. The NM **100** can schedule slot

allocations that best minimize the depth of the egress **132** and ingress **133** queues to minimize transmission delays ensuring quality of service (QOS) or class of service (COS).

[0043] FIGs 6A-6C, 7A-7C and 8 are illustrations of implementations of the optical local area network **50**. In one implementation shown in FIG. 6A, an NM **100** may function in a hub configuration **600** networking clients including workstations **602**, personal computers (PC) **604** and Ethernet switches **618** together using the Ethernet protocol. The workstations **602** and PCs **604** are connected to the hub configuration **600** with a network interface card (NIC) **606** containing an NCA 104 and a NIC controller **608**. In one implementation of the NIC **606**, the NIC controller **608** includes a GMII interface, an Ethernet MAC and a peripheral component interconnect (PCI) bus interface. The NCA **104** communicates to the NIC controller **608** through the GMII interface. Ethernet switches **618** are connected to the hub configuration **600** with a network adaptor **621A** containing an NCA **104**. Ethernet switches **618** can be conventional Ethernet switches. In one implementation of the network adaptor **621A**, the network interface **136** is a GMII interface.

[0044] In another implementation shown in FIG. 6B, the hub configuration **600** can network disk storage array devices **612**, servers **614** and FC switches **619** together using the Fibre Channel (FC) protocol. This implementation may be described as a Storage Area Network (SAN). The disk. storage array devices **612** and servers **614** are connected to the hub configuration **600** with a host bust adaptor (HBA) **607**. In one implementation of HBA **607**, the HBA controller **609** includes a serial interface, FC controller and a PCI bus interface. FC switches **619** are connected to the hub configuration **600** with a network adaptor **621B** containing an NCA **104**. FC switches **619** can be conventional FC switches. In one implementation of the network adaptor **621B**, the network interface **136** is a serial interface.

[0045] In yet another implementation of the optical local area network **50** shown in FIG. 6C, the hub configuration **600** may network clients such as workstations **602**, PCs **604**, disk storage array devices **612**, servers **614** and switches **618**,**619** (FIG. 6B) using both Ethernet and FC protocols concurrently. NICs **606** can connect a particular client to the hub configuration **600** using the Ethernet protocol. HBAs **607** can connect a particular client to the hub configuration **600** using the FC protocol. For example, workstations **602**, PCs **604** and switches **618** can communicate with the hub configuration **600** using Ethernet protocol while disk storage array devices **612** and servers **614** can communicate with the hub configuration **600** using FC protocol. The ODF **102** (not shown) of the optical local area network **50** can include splitters **620**. Hub configuration **600** can also connect to a switch **618** using an adaptor card **621A**. Adaptor card 621A includes an NCA **104** with a respective network interface **136** (e.g., GMII, XAUI, Serial). Switch **618** may be, for example, a switch in a conventional Ethernet LAN **622**.

[0046] One or more NMs **100** can interface to a switching device (e.g., a Layer-2 switch or a Layer-3 switch) to process frames from the various NCAs **104** according to a communication protocol of the switching device. Referring to FIG. 7A, a switch configuration **704** includes

multiple NMs **l00A**, **l00B**, **l00C** in communication with a Layer-2 switch device **700** which is in further communication with an uplink port **702**. In alternative implementations, the Layer-2 switch device **700** may be in communication with a plurality of uplink ports (not shown). Though three NMs **100A**, **100B**, **100C** are shown more or fewer NMs **100** may be in communication with a Layer-2 switch device **700** included in the switch configuration **704**. Each NM **100A**, **100B**, **100C** includes an adaptation unit **706** in communication with a NM Engine (not shown). The adaptation unit **706** receives and transmits data and messages in the form of frames, packets or cells according to the Layer-2 switch device **700** via a switch interface **708**. Adaptation unit **706** can provide buffering, data and/or message filtering and translation between the protocol of the Layer-2 switch device **700** and the protocol of the optical local area network **50**. The adaptation unit **706** includes an egress queue block (not shown) and an ingress queue block (not shown). Egress and ingress queues can be of the form of memory and are used for buffering receive and transmit data and messages, respectively. In one implementation of the NMs **100A**, **100B**, **100C**, all upstream traffic received by an NM **100** is passed through the switch interface **708** to the Layer-2 switch device **700**. All downstream traffic transmitted by an NM **100** is received by the NM **100** through the switch interface **708**. In another implementation upstream traffic received by an NM **100** can be filtered based on destination address to either pass data and/or messages back to one or more NCAs **104** multiplexed in downstream traffic (e.g. hairpinning) or to the Layer-2 switch device **700** through the switch interface **708**. The fiber connections **105** form a first ODF for connecting NM **100A** with one or more NCAs. The fiber connections **710** form a second ODF for cofnnecting NM **100B** with one or more NCAs. The fiber connections **712** form a third ODF for connecting NM **100C** with one or more NCAs.

[0047] In one implementation of an optical local area network **50** shown in FIG. 7A, the switch configuration **704** is used to network workstations **602**, PCs **604** and a Ethernet switch **618** together using the Ethernet protocol with appropriate NICs **606** as described above. The switch configuration **704** includes a Layer-2 switch (e.g., Layer-2 switch device **700**) that implements an Ethernet MAC and switching functions. The optical fibers **105**, **710**, **712** connecting the workstations **602**, PCs **604** and Ethernet switches **618** to the switch configuration **704** can be associated with different NMs **100A**, **100B**, **100C** depending on which fiber connections are used. The uplink port **702** of switch configuration **704** can connect to an Ethernet switch and/or router (not shown).

[0048] In another implementation of an optical local area network **50** shown in FIG. 7B, the switch configuration **704** is used to network one or more disk storage array devices **612**, servers **614** and FC-2 switches **619** using, for example, the FC protocol with appropriate HBAs **607** as described above. This implementation may also be described as a Storage Area Network (SAN). The switch configuration **704** includes a Layer-2 switch (e.g., Layer-2 switch device **700**) that implements an FC-2 controller and switching functions. The optical fibers **105**, **710**, **712** connecting the disk storage array devices **612**, servers **614** and FC-2 switch 619 to the switch configuration **704** can be associated with different NMs **100A**, **100B**, **100C** depending on which

fiber connections are used. The uplink port **702** of switch configuration **704** may connect to an FC-2 switch and/or router (not shown). FC-2 switches **619** can be a conventional FC-2 switch.

[0049] In yet another implementation of an optical local area network **50** shown in FIG. 7C, a switch configuration **704** is used to network workstations **602**, PCs **604**, 'disk storage array devices **612**, servers **614** and other switches (e.g. an Ethernet switch **618**) together using, for example, both Ethernet and FC protocols concurrently in a manner described previously. The switch configuration **704** includes a Layer-2 switch (e.g. Layer-2 switch device **700**) that implements both an Ethernet MAC and FC-2 controller with switching functions. Layer-2 switch device **700** can be implemented by a packet processor or network processor. The optical fibers **105**, **710**, **712** connecting the workstations **602**, PCs **604**, disk storage array devices **612**, servers **614** and t switches to the switch configuration 704 can be associated with different NMs **100A**, **100B**, **100C** depending on which fiber connections are used. The uplink port **702** of switch configuration **704** may connect to an Ethernet or FC-2 switch and/or router (not shown).

[0050] In yet another implementation of an optical local area network **50**, an implementation of switch configuration **705** containing an NM **100**, an adaptation unit **706** and an uplink port **702** is shown in FIG. 7D. Switch configuration **705** can be used to network workstations **602**, PCs **604** and other switches **618** in a manner described previously. The NM **100** is in communication with a Layer-2 switch device (not shown) through the uplink port **702** that is connected to a switch. The connection between uplink port **702** and switch **618** can be a physical layer connection **714** (e.g., 1000 BASE-SX,1000 BASE-LX). Ethernet switch **618** can be a conventional Ethernet switch.

[0051] In some implementations of switch configurations **704**, **705** the uplink port **702** can be an NCA adaptor (not shown) similar to **621A**, **621B** wherein the network interface **136** and switch interface **708** are coupled using the same interface standard (e.g., XAUI, Serial, Parallel), thus enabling the uplink port **702** to connect to other hub configurations **600** and switch configurations **704** (FIG.s 7A-7C), 705 (FIG. 7D).

[0052] In another implementation of an optical local area network **50** shown in FIG. 8, NM **100** and NCA **104** may be implemented in optical modules. A network manager in an optical module (NM-OM) **800** is provided that, in one implementation, conforms to an industry standard form factor and includes an NM-CLM **803** that includes an adaptation unit **706** to transfer data into and out of a network interface (e.g., switch interface **708**). The NM-OM **800** also includes a NM Optical interface **108** and an ODF port **117A**. In one implementation, the optical module NM-OM **800** conforms to an industry standard Multi-source agreement (MSA) form factor (e.g., 300pin, XENPAK, X2, XPAK, XFP or SFP). A network client adaptor in an optical module (NC-OM) **802** can be provided that, in one implementation, also conforms to an industry standard form factor and includes an NCA **104**. For example, the optical module NC-OM may conform to an MSA form factor (e.g., 300pin, XENPAK, X2, XPAK, XFP or SFP).

[0053] The NM-OM **800** can connect to a conventional router **804** that has optical module ports **806** using the router's switch interface (e.g., XAUI or Serial). The NM-OM **800** is in optical communication with an optical splitter **810** that splits light among and collects light from workstations **602**, PCs **604**, disk storage array devices **612**, servers **614** and switches using appropriate NICs **606** and/or NC-OM **802** as previously described. The Ethernet Layer-2/3 switch **808** may be of conventional design and include an uplink port, that in one implementation, conforms to an industry standard optical module form factor. The Ethernet Layer-2/3 switch **808** can communicate with the NM-OM **800** in router **804** by using an NC-OM **802** via network interface 136 (e.g., XAUI or Serial).

[0054] The Ethernet Layer-2/3 switch **808** is further detailed in FIG. 9A. In the Ethernet Layer-2/3 switch **808**, an NC-OM **802** is in communication with a Layer-2 switch **900** by means of a MAC (not shown) using a network interface **136** (e.g., XAUI or Serial). Ethernet Layer-2/3 switch **808** also includes physical layer ports (PHY ports) **902** that, in one implementation, form a conventional Ethernet LAN (e.g., Ethernet LAN **622** of FIG. 8) connecting network clients such as workstations **602** and PCs **604**.

[0055] An implementation of an alternative configuration for a switch is shown in FIG. 9B. FIG. 9B is an illustration of an NC-Switch **910**, in which no conventional Layer-2 switch and MAC is used. NC-Switch **910** includes an NCA **912** and multiple PHY ports **902**. Each PHY port may perform wireline (e.g., 10/100/1000 BASE-T, DSL) or wireless (e.g., IEEE 802.11, IEEE 802.16) physical layer communications with conventional LAN clients. In this implementation, the adaptation unit **126** supports multiple network interfaces **136**. The switching function previously performed by the Layer-2 switch (e.g., Layer-2 switch **900** of FIG. 9A) is consolidated to the switch or router in communication with an NM **100** in a switch configuration **704** (as described above) or an NM-OM **800** (e.g. as illustrated in FIG. 8 an NC-Switch **910** in communication with an NM-OM **800**). Alternatively, the switching function previously performed by the Layer-2 switch is consolidated to Layer-2 switches (not shown) in communication with other NCAs **104** networked in a hub configuration **600**.

[0056] In hub configuration **600** (e.g. FIG.s 6A-6C) of the optical local area network **50**, flow control, denial of service and other network administration functions are dependent on external Layer-2 devices in communication with NCAs **104** (for example, the Ethernet MAC or FC-2 controller in the NIC controller **608** dependent on the implementation as previously discussed). In switch configurations **704** (e.g. FIG.s 7A-7C) of the optical local area network **50**, flow control, denial of service and other network administration functions are further dependent on the external Layer-2 device **700** in communication with NMs **100**, in addition to the Layer-2 devices external and in communication with NCAs **104** as previously mentioned.

[0057] Although the invention has been described in terms of particular implementations, one of ordinary skill in the art, in light of this teaching, can generate additional implementations and modifications without departing from the spirit of or exceeding the scope of the claimed

invention. Accordingly, it is to be understood that the drawings and descriptions herein are proffered by way of example to facilitate comprehension of the invention and should not be construed to limit the scope thereof.

## CERTIFICATE OF COMPLIANCE
## UNDER FEDERAL CFR
## OF APPELLATE PROCEDURE 32(a)(7)
## & FEDERAL CIRCUIT RULE 32

This brief has a proportionally spaced 14-point typeface, and contains 10176 words, including footnotes and endnotes, based on the "Word Count" feature of Microsoft Word for Office 365 MSO®.  Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32(b), this word count does not include the Certificate of Interest, Table of Contents, Table of Authorities, Statement of Related Cases, addendums, and certificates of counsel including the Certificate of Service and this Certificate of Compliance.

Date: _Feb. 29, 2024_         _/s/ Derek Meeker_

                                                Derek Meeker

                                                _Counsel for Appellant_